**UNITED STATES of America**

**v.**

**Elizabeth Gurley FLYNN, Pettis Perry, Claudia Jones, Alexander Bittelman, Alexander Trachtenberg, Victor Jeremy Jerome, Albert Francis Lannon, Louis Weinstock, Arnold Samuel Johnson, Betty Gannett, Jacob Mindel, William Wolf Weinstone and George Blake Charney, Defendants.**

United States District Court
S. D. New York.

April 22, 1955.

J. Edward Lumbard, U. S. Atty. for the Southern Dist. of New York, New York City, for the United States. William F. Tompkins, Asst. Atty. Gen., of counsel.

Mary M. Kaufman, New York City, for defendants. Harry Sacher, Esq., New York City, of counsel.

DIMOCK, District Judge.

This is a motion by all defendants to set aside a verdict of guilty and for a new trial. Defendants were convicted of conspiracy to violate the Smith Act, 18 U.S.C. § 2385, making it an offense to advocate forcible overthrow of the Government. The convictions were affirmed by the Court of Appeals for the Second Circuit, 216 F.2d 354, and certiorari was denied by the Supreme Court, 348 U.S. 909, 75 S.Ct. 295. Defendants are now serving sentences of imprisonment.

The motion is based upon an affidavit of one Harvey Matusow in which he retracts testimony given in behalf of the Government on the trial. The testimony specifically retracted consists almost exclusively of assertions by Matusow that he heard certain defendants and others representing the Communist Party state in substance that it had as an object the overthrow of the Government by force and violence.

The Government attorneys when they prepared this case had before them the charge to the jury in United States v. Foster (Dennis), D.C. 9 F.R.D. 367, 393, and the opinion of the Court of Appeals which considered it, United States v. Dennis, 2 Cir., 183 F.2d 201. That charge required that, to find the defendants in a Smith Act conspiracy case guilty, the jury must be satisfied that each defendant intended teaching or advocating "with the specific intention and for the evil purpose of bringing about the overthrow or destruction of the Government of the United States by force or violence".

The most difficult task that faced the Government in the prosecution of the defendants on the trial was that of establishing the presence of this personal intent of each defendant to cause the overthrow of the Government by force and violence. That the Communist classics advocated the necessity of a forcible overthrow was a matter of mere documentary proof. The defendants, however, maintained that the American Communist Party had abandoned that tenet. From the standpoint of the Government, therefore, proof of individual advocacy of the use of force and violence was necessary and proof that that was a principle of the American party was highly desirable. Proof of those facts was difficult to obtain. For example, in spite of the exhaustive investigation of which a government is capable in the preparation for a prosecution for a crime against its existence, the evidence offered at the trial indicating personal participation of the defendants was insufficient in the case of two of them to warrant submission to the jury of the case against them even though they were both avowed Communists.

Matusow began operating as an undercover informant for the Federal Bureau

of Investigation in February 1950. He knew that the F.B.I. was investigating the Communist Party and its members in connection with Smith Act prosecutions. He knew further that the basis of a Smith Act case was the teaching and advocacy of the overthrow of the government by force and violence. Thus apprised of the object of his search, Matusow prepared and filed with the F.B.I. several periodic reports and, in October 1951, a final report of seventy-five pages. In not one of these is there a statement of any advocacy by the American Communist Party or any of its members of the duty of overthrowing the Government of the United States by force and violence. Matusow was certainly not unmindful of the subject for, in reporting on a trip to Puerto Rico in the seventy-five page report, he said that the Nationalist Party of Puerto Rico and the Communist Party of Puerto Rico were "one party of force and violence, actively working to get rid of the USA."

On December 19, 1951, on the invitation of an F.B.I. agent, Matusow attended a rendezvous in an automobile parked in a secluded street in New York. There were present Mr. Marks, Special Assistant to the United States Attorney, who was then in charge of the case, Messrs. Cohn, Blinder and Foley, Assistant United States Attorneys, all of whom were then assisting in the preparation of the case for trial, and Mr. McCarthy, an Agent of the F.B.I. who is also a member of the bar.

At this rendezvous interview, Matusow was asked particularly about party schools and, as disclosed by his diary, was asked what, if anything, he had heard any of the seventeen defendants say that was "part of the indictment." The indictment charged that the defendants conspired to advocate and teach the duty and necessity of overthrowing the Government of the United States by force and violence and to organize as the Communist Party a group who teach and advocate such overthrow and destruction. Matusow was thus alerted to the Government's search for evidence of the teaching of force and violence.

Agent McCarthy and Assistant United States Attorney Blinder both made notes of the interview at the motor car rendezvous. McCarthy immediately after the interview made a teletype report to headquarters in Washington and later, on January 30, 1952, he amplified it by a letter to the F.B.I. Director. Blinder, on January 25, 1952, transcribed his notes.

The preparation of Matusow as a witness was first assigned to Blinder. Due to a series of unforeseen events, the assignment was successively transferred first to Cohn and then to Assistant United States Attorney Reagan. Blinder and Cohn both prepared comprehensive "trial briefs" of the testimony that Matusow was expected to give and Reagan, who interviewed Matusow only a few days before he took the stand, contented himself with memoranda for organizing his examination of Matusow as a witness. Some of the "trial briefs" were prepared by putting questions to Matusow and having the questions and his answers taken down in stenographic notes and then reduced to narrative form by the stenographer and transcribed.

On February 17, 1952, Blinder saw Matusow for the first time after the motor car rendezvous. On February 18th he prepared a trial brief of that interview. On April 24, 1952, after further converse with Matusow, Blinder prepared a second and superseding trial brief. Matusow's preparation was then turned over to Cohn who, after seeing Matusow, made manuscript notations on Blinder's trial brief of April 24th and then produced one of his own, dated June 10, 1952. Reagan then took over and, some time in July, made a memorandum for use in Matusow's examination on the trial. All of these papers and, in addition, many of the stenographic notes have been preserved and were produced on the hearing.

My opportunities for getting an understanding of Matusow's character have

been very extensive. He testified before me for eight days on the trial of the case and for seven days on the hearing of this motion. On this motion there have been submitted, among many others of Matusow's productions, diary entries going as far back as the time when he recorded what he terms his "ideological break" with the Communist Party on New Year's Eve, 1948, his reports to the F.B.I., including the seventy-five page document, a letter to Senator McCarthy, a letter to the Russian Ambassador, his testimony before the House Un-American Activities Committee, his testimony before the Subversive Activities Control Board, Bishop Oxnam's descriptions of Matusow's two conversations with him, 165 pages of transcribed tape recordings of Matusow's conversations with the editor of his book "False Witness", and finally the book itself.

From before the time that he joined the Communist Party the course of Matusow's life has been determined by his inability to reconcile himself to the position of a man of no importance. He has been unable to attain a position of importance in open competition under the rules of the game. He sought importance within the closed competition of the Communist Party where the reluctance of many of ability to enter assured prominence to the zealous. He then sought importance by breaking the rules of the game that he was playing, first in bearing tales to the Government and then in bearing tales to the Communists. His mental attitude is revealed by the note that he made in his diary after the motor car rendezvous, "Mr. Cohn said he was almost sure that they would use me." He was not content to submit his seventy-five page report to the F.B.I. alone but turned over a copy to a newspaper reporter who specialized in Communist exposés. Each of the two turnabouts that Matusow has taken since joining the Communist Party has been calculated to enhance his importance. He made himself important to the Government by helping to build the Government's case against the Communists and now seeks, with the technique that he has gradually developed, to make himself still more important by breaking down the structure erected by the Government itself.

Matusow's craving for a role in the center of the stage has kept him chronically impecunious. His energies have been directed to the satisfaction of that craving, leaving no time for, or interest in, earning a living. Money, even in small sums, has thus meant much to him. For his services as an informer in 1950 the F.B.I. paid him $325 and reimbursed him for his expenses. The newspaper reporter to whom he had turned over a copy of the seventy-five page report wrote a series of articles based on it. They were published under Matusow's name and he divided with two others the $750 paid for it. He was in serious need of money at the time of the motor car rendezvous and, after testifying on the trial of this case, he sought (unsuccessfully) to get $25 a day, for the sixty-one days that he had spent in preparation and on the stand, instead of the customary $4 a day witness fee and $5 "per diem" which he had received from the Department of Justice for services as a prospective and actual witness in this case. In the period before his recantation he was borrowing sums like $5 and $10. That state of his finances was improved by advances from the publishers of his book "False Witness", a chapter in which is based upon his recantation in this case.

Matusow is a completely irresponsible witness. On the hearing of this motion he claimed privilege against disclosing the name of a spiritual adviser to whom he said he had confessed his alleged perjuries. Decision of the question of privilege was deferred until the next morning and he was asked to write down the name of the spiritual adviser and seal up the paper and deliver it to the court to be kept until the decision should be reached. What Matusow was writing on the paper seemed to take more time than if it were merely a name and he was asked four times whether he had written the

name of a person. To each question he replied that he had. When, on the next morning, his claim of privilege was rejected and the paper was opened, it appeared that Matusow had written "The Church of Jesus Christ Latter Day Saints in Dallas, Texas. I talked to a few leaders of the Dallas Stake." He had not only lied under oath but under circumstances where he knew that there was a substantial chance that he would be caught.

Moreover, as will hereinafter appear, charges made by Matusow that it was Assistant United States Attorney Cohn who suggested to him certain testimony were proved to be false by documentary evidence.

The Matusow who first brought his tales to the Government and who was being prepared to act as a witness by the Government lawyers and who was on the witness stand in the trial was a man without regard for the truth, with a passion for the limelight and with the need for a few dollars. The Matusow who retracted his testimony was the same man. Which was the lie, the original story or the retraction?

Government counsel say that the retraction was the lie. They say that persons acting in the interest of the defendants here and of one Jencks, who was convicted in another case in which Matusow testified, took advantage of Matusow's chronic need of money and induced the recantation. The charge is that these persons paid for the recantation in the guise of paying Matusow for work on the book "False Witness" which was to be published under his name. The fact is that it was news of a statement by Matusow that he had been giving false testimony that led these persons sympathetic to the defendants to seek his aid. Matusow had made that statement to Bishop G. Bromley Oxnam, of the Methodist Church, on April 27, 1954. Bishop Oxnam disclosed it in a speech on June 7th. Undoubtedly the financial assistance given Matusow was a factor in inducing the actual execution of the affidavit on which this motion is founded but Matusow's admission that he had been lying came first. That was not induced by friends of these defendants, nor I must admit, by any preference that Matusow had for truth as against falsity. It was induced by Matusow's yearning for a place of importance. He had squeezed dry the orange of informing and was prepared to begin on the orange of recanting.

The internal evidence all points to the original story as the lie. The pattern of its development creates a probability of fabrication that becomes almost a certainty in the light of Matusow's propensity to lie.

Not a single one of the damaging statements made by Matusow on the stand was recounted by him in its damaging form the first time that he referred to it in the course of his preparation as a witness. That was not because he did not know what his interrogators wanted. At his first meeting with Government attorneys he was shown the indictment and questioned with respect to its charges. During the period between this first meeting and the interview with Blinder on February 19, 1952, Matusow had a copy of the indictment in his possession. He had been instructed to study it and to search his recollection for material relating to the charges against defendants. Nevertheless, in no instance was the initial version of a story given by Matusow probative of the fact that one or more of the defendants or the Communist Party advocated, during the period covered by the indictment, the forcible or violent overthrow of the Government. When Matusow's testimony was finally given, its only material variance from these initial versions consisted in embellishments indicating advocacy of force and violence.

It may be asked why, if Matusow was so irresponsible and ambitious and knew of the Government's desire for evidence of force and violence, he did not put his best foot foremost and tell his manufactured stories in their most lurid form at the outset. The answer is, I believe, the simple one that it took time for

Matusow to develop his technique. Perhaps the role was too new a one for him. As time passed he may have felt more secure or seen more clearly his opportunities.

Matusow's stories developed gradually and his successive statements and "trial briefs" enable us to watch their unfolding. They unfolded in a way very different from the way one would expect that the testimony of an honest witness would naturally develop under preparation of the lawyers who expect to call him. In every case the effective thrust was finally given in connection with something about which Matusow had first given his interrogators a comparatively innocent statement. Sometimes, even after a damaging tinge had been added to the original story, the color was deepened in a subsequent version. It is incredible that, with the search for advocacy of force and violence uppermost in his consciousness, Matusow's memory would first recall a matter to his mind in an innocuous form and, on some later occasion, recall the damaging feature indicative of the advocacy of force and violence. As is said in 3 Wigmore on Evidence, 3d ed., Section 1042, p. 733:

> "A *failure to assert* a fact, when it would have been natural to assert it, amounts in effect to an assertion of the non-existence of the fact. This is conceded as a general principle of Evidence".

A good example is the story of defendant Charney and the situation in Puerto Rico. The seventy-five page report says that defendant Charney briefed Matusow before Matusow's trip to Puerto Rico and told him to make arrangements when he got there for the sending of a delegate to the World Youth Festival in Budapest. When Matusow spoke to the Government attorneys at the motor car rendezvous, the message that Matusow was told to convey to the Puerto Rican Communists had grown to a statement that they should first fight for Puerto Rican independence and then for Communism. By the time of the next session, Matusow "remembered" that Charney had said that the United States was not going to give up Puerto Rico without a fight and that the Communist Party would be a leader in that fight. Before the next edition of the trial brief came out, Matusow had "remembered" that Charney had said that the Communist Party of Puerto Rico would be leading in that fight assisted by the Communist Party of the United States. By the time that Cohn wrote his trial brief, Matusow's memory had got as far as to recall that Charney had said that the United States, because of Puerto Rico's position as a key military base, would not give it up and that therefore the Communist Party of the United States must work for the overthrow of United States rule in Puerto Rico. Finally, when Matusow got on the stand in the trial, he "remembered" that Charney had also said that an independent Puerto Rico would help destroy the United States bases and cripple the Caribbean defense. Here we have a case where an informer, knowing that his hearer wishes information as to the advocacy of the use of force and violence by the Communist Party, recalls a conversation with a Communist leader. At first he remembers only that the leader said that the Puerto Rican Communists ought to send a delegate to the Budapest Youth Festival but, after "remembering" a series of successively more damaging statements, ends with the recollection that the leader had said that the Communist Party of the United States should help the Puerto Ricans to obtain their independence in order to cripple the Caribbean defense of the United States. It is incredible that this was merely improved recollection.

Other instances are the reports of advocacy by defendant Johnson and by Henry Winston of aid to Russia in the event of war. The seventy-five page report says that Johnson urged in a speech that youth should get out into industrial centers and get a hold on basic industry. At the motor car rendezvous Matusow said that this was "for eventual use in revolution." That gloss was

dropped out of the trial briefs prepared at subsequent interviews. By the time Cohn finished interviewing Matusow, however, Matusow had "remembered" that Johnson had added "so that in the event of war with Soviet Union we would have people on our side to help us." The seventy-five page report also says that Winston (Organizational Secretary of the Communist Party) said in a speech in Philadelphia that people ought to get out into basic industry and says further that discussions on the train back to New York dealt with "a continuation of the subject of Winstons talk in Phila." In the trial briefs, Winston is first mentioned in Blinder's of February 18, 1952, simply as the author of an article advocating concentration in basic industry, but by the time he worked with Cohn Matusow had reverted to the Philadelphia trip. Cohn's trial brief records the fact that Matusow, by the time that it was prepared, "remembered", in language reminiscent of the Johnson story, that Winston on the train had favored concentration in industries "so that we could rally the workers to our support in the event of war in [sic] the Soviet Union."

Another three-step build-up was the case of defendant Perry. Neither the seventy-five page report nor any of the reports of the motor car rendezvous mentions Perry. At Matusow's second interview, however, he remembered that Perry had made a speech at which he advocated the establishment of a Negro nation in what Perry called the Black Belt in the South. Working with Cohn, Matusow added that Perry had said that only under a government of socialism run by the Communist Party could the Negro nation be established and that the only way that this could be done was by the overthrow of the capitalist system and establishment of the dictatorship of the proletariat. By the time that Matusow testified on the trial he had recalled that Perry had said in this speech that, as a condition to setting up this Negro nation, "the working class led by the Communist Party would have to forcibly overthrow this bourgeoisie".

One Beatrice Siskind is mentioned in the seventy-five page report as having taught a course on political economy in the Institute of Marxist Studies. She is mentioned again in that capacity in the records of Matusow's interviews made February 18 and April 24, 1952. Cohn's record of June 10, 1952, for the first time brings up the subject of "American exceptionalism" and reflects Matusow's recollection that Beatrice Siskind defined it as the theory that, in America, the working class and the capitalists could live together. When Matusow testified, he "remembered" that Beatrice Siskind had added that socialism "could not be obtained by collaboration, that the capitalists or bourgeoisie would not give up without a struggle, and therefore the working class, under the leadership of the Communist Party, would have to take over by power and overthrow the bourgeoisie."

Another example of Matusow's delayed action recollection is the case of Mrs. Wallach and what Matusow called the "Glass of Water Theory". That theory, the substance of which appears in the officially approved "History of the Communist Party of the Soviet Union", is that all change must be violent. At the motor car rendezvous Matusow recalled that he had been taught the "Glass of Water Theory" at the Marxist Institute. He never told of recalling anyone named Mrs. Wallach until his conversations with Cohn and then all that he reported was that he had received a brochure for club leaders from a person of that name. By the time that Reagan was preparing Matusow, however, Matusow was able to "remember" a most elaborate exposition of the "Glass of Water Theory" by Mrs. Wallach ending with the words "[s]o will the change from Capitalism to Socialism be sudden and violent."

Blinder's "trial brief" of April 24, 1952, introduces the subject of Vishinsky's book, *"The Law of the Soviet State"*. That book begins with a most forthright endorsement of violent overthrow of capitalistic government as the basis of Soviet law. An unsuccessful at-

tempt had been made in the first Smith Act case, brought against Dennis and others, to get it into evidence. The Blinder April trial brief attributes to Matusow the statements that one Ben Bordofsky had told him that a book could not be sold in the Jefferson School Book Shop unless approved by defendant Trachtenberg and that one Sid Ballinger, manager of the Jefferson School Book Shop, had told Matusow that "*The Law of the Soviet State* by Vishinsky which had been published by the Macmillan Company would be on sale in the book shop and the material contained in it must be gotten over to the comrades." Thus a very tenuous connection between the book and Trachtenberg was suggested and Blinder noted that at this point in Matusow's testimony the book would be offered in evidence.

Cohn's trial brief dropped out all reference to defendant Trachtenberg in connection with the Vishinsky book "The Law of the Soviet State". Reagan says, however, that one day, three or four days before Matusow went on the stand, he was asking Matusow about "conversations he had with everyone, and in particular the defendants, and in particular Trachtenberg" and that Matusow said that Trachtenberg had told him to push "The Law of the Soviet State", that it was the latest description of Soviet Law and it was important for American members to become familiar with it. The Government witnesses say that Reagan took Matusow into Marks' office with the exclamation "Wait until you hear this", and announced, "Mr. Matusow now connects Mr. Trachtenberg with *The Law of the Soviet State,* and listen to what he has to say about it." When Marks had heard the story he asked Matusow if that was really what Trachtenberg had said. Matusow became a little irritated and, after replying in the affirmative, said that he would not testify to it if they did not want him to. Reagan assured him that they did.

Matusow testified on the afternoon of July 21, 1952, on the subject of "*The Law of the Soviet State*", substantially as he had told Reagan, that Trachtenberg had said that the book would be useful in the party in that the concepts propounded therein were diametrically opposed to the English law. Objection to the introduction of the statement in the book as to the necessity of violence was made on the ground that this testimony did not constitute sufficient foundation. Court recessed with the question of admission still undecided. Before the next session (Reagan says that it was during the next session but there was no recess when a meeting could have occurred) Reagan and Matusow met and, in answer to Matusow's question as to how he was doing as a witness, Reagan replied "we don't have enough to get in evidence this Law of the Soviet State". The next morning the parties argued the question of the admissibility of the extract. During this argument Matusow was in the courtroom still on the stand. The court ruled that the extract must be excluded on the ground that Trachtenberg's reference to the author's treatment of a law diametrically opposed to English law did not constitute an endorsement of the part about the necessity of violence. Reagan then asked Matusow whether Trachtenberg had said anything else and Matusow answered: "He went on further to say that in talking about the book, the law of the Soviet State, that the question of capitalism and socialism here, or the creating of a socialist society and eliminating class antagonisms, how that was to be accomplished through the establishment of socialism, how the diametrically opposed classes could be eliminated—were found in that book." On a reoffer the extract was admitted as bearing on the intent of the defendant Trachtenberg only. Matusow had saved the day.

Thus does the history of the development of Matusow's testimony on the trial demonstrate its falsity. That history was not available to the jurors who presumably believed the testimony. They had but four things before them to indicate Matusow's unreliability. First, there was Matusow's bearing as a "flip"

or "glib" witness, a description with which one of the assistant United States attorneys was led to agree on the hearing of this motion. Second, there was his manner of delivering the several clichés about force and violence. That was so different from the recounting of the less damaging part of his testimony as to suggest interpolation to me. Third, there was the fact that certain parts of the seventy-five page report which were submitted to the jury had recounted episodes about which Matusow had testified on the stand but had recounted them without the clichés that made the testimony damaging. Fourth, the jury heard Matusow save the day by recalling just what was necessary to get into evidence the extract from "The Law of the Soviet State" after his first effort had been unavailing.

The evidence that is now for the first time available throwing light on Matusow's character and showing the history of the development of his testimony presents an entirely different question from that before the jurors when they passed on Matusow's credibility. There has become available since the trial, not only the certainty in the alternative that Matusow lied either when he testified or else when he recanted, but also the absolute certainty that he lied in making statements in support of the recantation. The demonstrated falsity of these statements adversely affects the credibility not only of the recantation, but also of the original testimony. It is quite as likely that Matusow lied both at the trial and in support of the recantation as that he told a completely truthful story on one occasion and a completely false one on the other. This proof of Matusow's propensity to lie, coupled with the results of my observation of him and of my study of the relevant writings in evidence, forms the basis of my estimate of his character. That estimate leads me to believe that his craving for importance and his need of money overcame any scruples that he might have had against perjury when he testified on the trial. The newly revealed history of the development of his testimony furnishes internal evidence that perjury was committed. This internal evidence of perjury and my belief that Matusow had no scruples against it compel me to find that all of his testimony which attributed to the Communist Party or to any of the defendants an intent that the Government be overthrown by force and violence was false.

Matusow attributed all of this false testimony to suggestions by the attorneys for the Government who were preparing him for testifying. During the interval before the Government produced the records of his interviews with the attorneys, he charged Cohn specifically and in great detail with inspiring two of the items of damaging testimony, the item coupling Trachtenberg with "The Law of the Soviet State" and that coupling Beatrice Siskind with advocacy of the overthrow of the bourgeoisie. Neither of these damaging statements was added to the "trial briefs" until after Cohn had retired from his work in preparation of Matusow so that the detailed attribution to Cohn was made up out of whole cloth. These false statements that Matusow made were almost as bald as his assertion that he had written down the name of his spiritual adviser.

Defendants originally made the accusation that Matusow's perjury was suborned by the Government attorneys, but that charge is not being pressed. It has proved to be without foundation. The specific charges against Cohn above referred to were conclusively disproved. The other general charges made against the Government attorneys are categorically denied by them. I cannot accept the word of a proved perjurer against theirs and the circumstantial evidence is all in their favor. I find that all of Matusow's fabrications were his own suggestions. By hindsight we can see that the Government attorneys were credulous but they did not have the benefit of the knowledge of Matusow's character that the developments of the years have brought.

Since I find that the prosecution did not knowingly present false testi-

mony, see White v. Ragen, 324 U.S. 760, 764, 65 S.Ct. 978, 89 L.Ed. 1348, the result of my finding of Matusow's perjury is not an automatic granting of the motion for a new trial.

There therefore remain the questions formulated in Larrison v. United States, 7 Cir., 24 F.2d 82, 87–88, whether

(1) without the perjured testimony the jury *might* have reached a different conclusion, and

(2) the party seeking the new trial was taken by surprise when the false testimony was given and was unable to meet it or did not know of its falsity until after the trial.

I shall first apply myself to the second of these questions because the answer to it disposes of the cases of most of the defendants. Defendants have introduced no evidence tending to show that there was any of this false testimony that they were unable to meet or that there was any of it the falsity of which they did not know until after the trial.

Defendants say that, even where the false testimony related utterances made in the presence of persons other than a defendant, the fact that they could not meet it must be deemed established without proof. They say that the mere presence of a witness at one of the meetings and conferences described would have come so close to branding him as a Communist that he would have claimed his privilege against self-incrimination rather than testify. That I cannot assume. All of the defendants in the case at bar conceded membership in the Communist Party. A Communist newspaper, the Daily Worker, was published each day with the names of its staff at the masthead. Abraham Magill, who was one of its former editors and who admitted present membership in the Communist Party, testified on behalf of defendants. For all I know the meetings about which there was false testimony were attended by many who were so convinced of the righteousness of the Communist cause and so proud to support it that they would have proclaimed their party memberships from the housetops. I cannot presume that defendants could not have found anyone who would not have claimed his privilege against self-incrimination. To make this point good defendants should have shown properly diligent attempts to find witnesses who would testify. I cannot consider as a basis for setting aside the convictions any of Matusow's recantations which deal with occurrences where persons other than defendants were present. Since defendants have failed to show that they could not meet Matusow's testimony with respect to occurrences in the presence of persons other than the defendants, it is unnecessary for me to consider the question whether the jury might have reached a different verdict if Matusow's testimony about these occurrences had not been given.

In instances where the statements were made to Matusow by a defendant privately, it goes without saying that the defendant was unable to meet the false testimony without taking the stand. That, in my opinion, was the equivalent of not being able to meet it at all. A wrong is done a defendant whenever a witness tells lies about him on the stand. A defendant in a criminal case has a constitutional right to remain silent. I cannot reconcile myself to the thought that a defendant by exercising his constitutional privilege to remain silent while this wrong is being perpetrated waives his right to have the results of the wrong corrected.

The only statements which Matusow says were made privately by defendants to Matusow are Trachtenberg's statement as to "The Law of the Soviet State" and Charney's statement as to the desirability of United States Communist participation in destroying United States bases in Puerto Rico and wrecking the Caribbean defense. The question remains whether, without this perjured testimony as to Trachtenberg and Charney, the jury *might* have reached a different conclusion.

With respect to the verdicts against defendants Trachtenberg and Charney,

to put the question is to answer it. The first page of "The Law of the Soviet State" was the strongest single item of evidence against Trachtenberg and the conversation about Puerto Rico was almost the only persuasive evidence of Charney's personal intent.

It is true that one of the many matters requested by the jury during its seven days of deliberation was the reading of the witness Lautner's testimony about defendant Charney and that no request was made that any of Matusow's testimony be read. It is also true that Lautner's testimony was not so damaging as Matusow's in that it merely connected Charney with various publications, statements and activities of the Communist Party and of other Communists rather than reporting actual espousal of force and violence by Charney. I cannot say, however, what significance, if any, should be attributed to those facts. All that they surely mean is that one or more of the jurors wanted to have clarified their recollection of what Lautner had said about Charney. That does not shake my conviction that the verdict against Charney might have been otherwise were it not for Matusow's testimony.

With respect to the verdicts against the others, I cannot admit of the possibility that they might have been different without Matusow's testimony as to these two incidents. The perjured testimony against Trachtenberg was admitted against him alone so that it could not have given any support to the verdicts against the others. As to the perjured testimony about the intention of the Communist Party to support a movement that would destroy United States bases and cripple the Caribbean defense, I cannot believe that, in the mass of evidence in this case and the context of this evidence, the verdict against anyone but Charney could have been affected by its absence.

The motion to set aside the verdict and for a new trial is granted as to defendants Trachtenberg and Charney and denied as to all other defendants.