Clinton E. **JENCKS**, Appellant,

v.

**UNITED STATES** of America,
Appellee.

No. 15557.

United States Court of Appeals
Fifth Circuit.

Oct. 26, 1955.

Rehearing Denied Dec. 1, 1955.

Arthur T. Hannett, Albuquerque, N. M., Edmund B. Elfers, El Paso, Tex., Harry L. Bigbee, Santa Fe, N. M., John T. McTernan, Los Angeles, Cal., for appellant.

Holvey Williams, Asst. U. S. Atty., El Paso, Tex., William F. Tompkins, Asst. Atty. Gen., David H. Harris, Atty., Dept. of Justice, Washington, D. C., Russell B. Wine, U. S. Atty., San Antonio, Tex., Brandon Alvey, Clinton B. D. Brown, Attys., Dept. of Justice, Washington, D. C., for appellee.

Before TUTTLE, CAMERON and JONES, Circuit Judges.

CAMERON, Circuit Judge.

(1) This opinion supplements that filed in the case under No. 15,157, 5 Cir., 226 F.2d 540, wherein the judgment of conviction entered January 21, 1954 was affirmed. On January 28, 1955, while the appeal from that conviction was pending, appellant filed a motion for a new trial based upon newly discovered evidence. The motion for new trial was denied by the court below after an extended hearing, its order being entered March 12, 1955. The motion was based upon the ground that Harvey Matusow, a witness who had testified at the trial, had recanted portions of the testimony he had

given and the motion was supported by an affidavit executed by Matusow in New York on January 20, 1955.

At the hearing [1] appellant relied upon the affidavit of Matusow and the oral testimony given by him as appellant's witness. The Government produced and examined ten witnesses along with a large number of exhibits. At the conclusion of the hearing the court below announced that an order would be entered denying the motion, and thereupon called Matusow before it and spoke these words to him:

"* * * after listening attentively to your testimony and the other testimony and proceedings on this motion, I am thoroughly convinced that you are in contempt of this court in that you, alone or in conjunction with others, deliberately and maliciously and designedly schemed to obstruct justice in this court, and in furtherance thereof have caused the filing of the affidavit in this cause and thereby obtained the hearing in this court on the motion for a new trial which has just been concluded. *By recanting your former testimony, given in this court, which I believe in substance was true,* you have, in my opinion, deliberately, designedly and maliciously attempted to obstruct the justice of this court * * * I am convinced from your actions, conduct and testimony had and done in my presence during this hearing, that you have deliberately and maliciously obstructed the justice of this court and contempted this court *for the purpose of furthering your personal gains.* * * *"* (Emphasis supplied.)

From this statement and from the record as a whole it is manifest that the trial judge, who had sat also through the main trial, was convinced that the testimony given by Matusow at the trial was substantially true and that the testi-

<hr />

[1] The trial which resulted in the conviction and sentencing of appellant (No. 15,-157) will be referred to as "the trial" and the hearing on the motion for a new trial (No. 15,557) will be referred to as "the hearing".

mony given on the hearing of the motion for new trial was corruptly false. The question before us is whether we should set aside those findings.

■ (2) Recent decisions of the Supreme Court and of this court furnish a clear blue print of the law which shall guide us in passing upon this motion. In United States v. Johnson [2] the Supreme Court granted certiorari to the Court of Appeals for the Seventh Circuit, "Since we think it important for the orderly administration of criminal justice that findings on conflicting evidence by trial courts on motions for new trial based on newly discovered evidence remain undisturbed except for most extraordinary circumstances * * *".

The Court of Appeals [3] had first affirmed the District Court's action in that case in overruling a motion for new trial based on newly discovered evidence and later [4] had reversed the order of the District Court overruling an amended motion based upon additional evidence that the chief prosecuting witness had committed perjury.[5] The Supreme Court felt that the case before the Court of Appeals was so lacking in merit that the appeal should have been dismissed: 327 U.S. at pages 111–113, 66 S.Ct. at page 466.

"The crucial question before the trial court was one of fact: Did the new evidence show that Goldstein's original testimony was false. The trial judge after carefully studying all the evidence found that there was nothing to show perjury on the part of Goldstein, that Goldstein had in fact told the truth, and concluded that a new trial was not warranted. The trial court thus answered the above question in the negative. * * * But it is not the province of this Court or the Circuit Court of Appeals to review orders granting or denying motions for a new trial when such review is sought on the alleged ground that the trial court made erroneous findings of fact [citing cases]. While the appellate court might intervene when the findings of fact are *wholly unsupported by evidence* [citing cases] it should never do so where it does not clearly appear that the findings are *not supported by any evidence.* * * * We think that even a casual perusal of this record should have revealed to the Circuit Court of Appeals that here nothing more was involved than an effort to upset a trial court's findings of fact." (Emphasis added.)

In Harrison v. United States [6] the situation presented to us was much the same as the one now before us. The recanting witness had been "the main prosecuting witness for the government at appellants' trial." He swore, on the motion for new trial, that the evidence given by him was untrue and that appellants never had any interest in or connection with his activities leading to their conviction. We sustained the ac-

---

2. 1946, 327 U.S. 106, 66 S.Ct. 464, 466, 90 L.Ed. 562.

3. 7 Cir., 142 F.2d 588.

4. 7 Cir., 149 F.2d 31.

5. In the second hearing the Court of Appeals had reviewed at great length the affidavits offered as establishing the perjury relied upon and, based upon decisions holding that the reviewing court is in as good position as the District Court to make deductions and conclusions from affidavits, had held [149 F.2d 42]: "As our opinion discloses, we have reached the conclusion that Goldstein testified falsely at the trial. The conviction which we

entertain in this respect is without reservation. In this situation, what is our duty as a reviewing court? Must we lay aside such conviction in deference to a contrary finding by the trial court? To do so is to acknowledge our impotency to correct what otherwise may amount to a gross miscarriage of justice. We are of the view that the fundamental right to a fair trial is not dependent upon a thread of such tenuous nature."

6. 5 Cir., 191 F.2d 874, language quoted from page 876; and see also Weiss v. United States, 5 Cir., 1941, 120 F.2d 472; Weiss v. United States, 5 Cir., 1941, 122 F.2d 675.

tion of the District Court in overruling the motion based upon this recantation, using this language:

"It seems now to be settled that the order overruling the motion for new trial is a final order from which an appeal will lie. However, the court cannot substitute its judgment on the facts for that of the trial judge; it has no power to try the facts *de novo;* it can review the record for errors of law only, to determine, among other things, whether the trial judge has abused his discretion * * *.

"The trial judge, from his knowledge of the original trial, from having heard the witnesses testify and observed their demeanor on the stand, was better qualified than is this court to pass on the affidavits. We do not find that the trial judge abused his discretion in overruling the motion for new trial."

(3) To apply those tests to the facts of this case is to perceive readily that there are no grounds for holding that the court below abused its discretion. The reason for sustaining the trial court's findings here are stronger than they were in either of the cases quoted from. There the court below was construing affidavits only, while here it had the advantage of observing the witness for a number of days as he proceeded to unfold the recantation. In considering the recantation, the trial judge proceeded with a fresh personal knowledge of the issues involved and of the impression made by the witnesses, including the recanter, at the trial and at the hearing, and he also had the "feel of the case" in a measure which can never be imparted by a printed transcript. His vantage point gave him a perspective which we could not hope to attain.

As the evidence on the hearing proceeded the trial court was faced with the duty which confronts all triers of fact—to separate the truth from falsehood and to reach conclusions based upon the weight of the evidence. The prompt and decisive action taken by the District Court and the language used point clearly to the fact that the truth of the matter was perfectly clear to it.

The court below had other grounds than the mere observation of Matusow, as he testified at the trial and at the hearing, for concluding that Matusow gave testimony which was substantially true at the trial and that the recantation was pure fabrication. "Environment illuminates the meaning of acts, as context does that of words. What a man is up to may be clear from considering his bare acts by themselves; often it is made clear when we know the reciprocity and sequence of his acts with those of others * * * ".[7] It was proper for the court below to consider that Matusow had little demonstrable motive for lying at the trial, and the basest of all motives, personal gain, for the recantation. A brief look at that feature of the evidence will be found helpful.

(4) A few months after Matusow had testified at the trial appellant's attorney began activities which culminated in Matusow's affidavit of recantation and his testimony at the hearing. Early in August, 1954—his testimony at the trial had been given in January—the attorney prepared a motion for a new trial upon indirect information he had obtained. Consultation with associate counsel resulted in the conclusion that such an effort then would prove abortive, and a conference of appellant's lawyers was held in New York City on September 13th. Being advised that Matusow had *unsuccessfully sought financial assistance in the publication of the book whose outline he had prepared,* the lawyers decided to cultivate Matusow by assisting him in the publication of the book. To that end the attorney [8] procured author-

---

7. Mr. Justice Jackson in Cramer v. United States, 1945, 325 U.S. 1, 32, 65 S.Ct. 918, 924, 89 L.Ed. 1441.

8. The attorney who carried out the arrangements thus agreed upon was General Counsel for Mine-Mill in addition to being Attorney of Record for Appellant. He also testified at the hearing.

ity from the officials of Mine-Mill at a meeting in Butte, Montana to spend the money reasonably necessary to accomplish the publication of Matusow's book, the initial advance being fixed at one thousand dollars. The attorney then went in company with appellant to a publisher whose interest Matusow had theretofore sought to enlist, one Kahn, and made the first advance of money to him with instructions that he track down Matusow and arrange for the writing and publication of the book. The publisher was employed to take full charge of the enterprise but was admonished not to reveal to Matusow the appellant's or the attorney's connection with it.

The publisher located Matusow through his parents and asked him, over long distance telephone, to come to New York to discuss the publication of his projected book and airplane passage was arranged. Although the publisher had never before been advised of the precise type of book contemplated by Matusow, a contract for its publication was entered into between the publisher and Matusow on the day following his arrival. The publisher arranged that Matusow should occupy an apartment in New York City and dictation of the book was begun into a tape-recording machine, the publisher asking questions and Matusow answering them. The publisher maintained contact throughout this period with the officials of Mine-Mill, sometimes approaching them directly, but most often through the attorney. The union and the attorney made advances from time to time aggregating at least $3,250.00, and there is evidence that the union, including the Canadian subsidiary, agreed to purchase a total of eleven thousand five hundred copies of the book at a cost of nearly Six Thousand Dollars; and the union membership of about eighty thousand became actively engaged in the sale of the book, opening up a wide field of probable income to Matusow.

On October 23rd, when the publisher approached Matusow in New Mexico, the latter had been reduced economically to the low estate of doing menial jobs and calling on his erstwhile friends for small loans in order to eke out a bare existence, finally having to induce an innkeeper to trade him a few nights' lodging for his bicycle on which he was making a tour of that country. There was credible evidence that, on the night of that telephone call, Matusow flashed a roll of bills to a friend with whom he was dining, stating that he had received an advance of One Thousand Dollars from his publisher in addition to a plane ticket to New York.

During the days intervening between his arrival in New York and December 14, 1954, Matusow and the publisher had proceeded with the initial draft of his book. The publisher was in constant touch with the attorney, but Matusow did not know this. The title of the book, whose outline Matusow presented to the publisher upon his arrival, was "Blacklisting Was My Business", and the outline made no mention of appellant or of any false testimony. On December 14th, responding to a question from the publisher as reflected by the transcript of the tape-recording, Matusow dictated:

> "I knew Jencks was a Party member and I said so. I can't say here that Jencks wasn't a Party member after he signed the affidavits because I know that he was. But I shouldn't have testified. That's the important thing. * * * "

Other statements appear in the same transcript showing that Matusow was beginning to shade his statements about Jencks to some extent, but he was not at that time sufficiently alive to what was expected of him to alter sufficiently the statements he had consistently made in order to suit the desires of those with whom he was dealing. Under these circumstances, the publisher thereupon made known to him the attorney's connection with the enterprise and took Matusow to the attorney's office. As of that moment the tape-recording sessions were abandoned. What transpired at the attorney's office on December 14th is unknown, but Matusow did admit that he received assurance from the attorney

that the Government would experience great difficulty in basing any prosecution of him on any recantation he might make, and that prosecution seemed unlikely because of the adverse effect it would have on this and other pending cases.

Matusow immediately set about to construct rapidly a chapter concerning appellant's trial and delivered it to the lawyer, who, on January 9, 1955, submitted it to the Board of Directors of Mine-Mill and upon his return to New York work was begun on the recantation affidavit. Substantially one month after the happenings of December 14, therefore, Matusow produced a draft of this chapter in his book dealing with appellant's membership in the Communist Party, each page of which the attorney required that he sign. The spontaneous statement of December 14th above quoted had been transformed to read in part as follows:

"Jencks was not alone. Others have been indicted for the same charge. Accused of being members of the Communist Party after they had signed the Non-Communist Affidavit of the Taft-Hartley [29 U.S.C.A. § 141 et seq.]. Jencks could have been a Communist Party member, yes. I had no way of knowing it. And I didn't care. Jencks had been a Communist Party member and I presumed he had submitted his resignation as others had done prior to his signing the Non-Communist Affidavit. But, to my mind at the time, a piece of paper didn't make him any less a Communist."

Followed promptly Matusow's signature to the affidavit of recantation dated January 20, 1955, and a trip by the publisher to the executive board of Mine-Mill at which he secured approval of a cash payment of Two Thousand Dollars. The title of the book had then been changed to "False Witness". One of the sequels to the publication of the book was a report by one of the Mine-Mill officials most active in its publication to a conference of Mine-Mill Defense Fund, in which he signalled a drive to discredit all government witnesses in Communist prosecutions.

Upon the hearing Matusow gave testimony of a much stronger nature in favor of appellant than had been set forth in his affidavit or in the chapter of his book[9] dealing with this case. Further, he joined in the movement to discredit government witnesses generally by delivering a number of tirades against the Department of Justice and its attorneys, extending his vilification to members of Congress and other government officials. His boldness increased as prospects became brighter for the sale of his book.[10]

(5) The cross-examination of Matusow produced discrepancies between his oral testimony and his affidavit of recantation, and he was contradicted by witnesses introduced by the Government at the hearing, particularly with respect to the events preceding his hurried trip from New Mexico to New York in response to the publisher's telephone call. Among these were two Mormon missionaries whose testimony tended to contradict that of Matusow on vital matters, and the ticket agent at the airport, who stated that Matusow told him he was on the way back to New York to write a book and "they are not interested in the truth but as long as they will pay money for it I will write anything".

(6) The court below also had before it testimony and statements made by Matusow before and after the trial which supported his trial testimony and discounted his recantation. On three occasions before the trial he had testified under oath to facts which squared in the main with his testimony at the trial: before the Senate Internal Security Sub-

---

9. Chapter 16 of *False Witness* entitled "Witness For the Persecution".

10. He made the statement, while on the stand, that he hoped to sell a million copies, it already having appeared in Poland, an Iron-Curtain country, and was being run as a serial by a French Newspaper.

Committee holding hearings at Salt Lake City October 8, 1952, before the Federal grand jury in El Paso, Texas on April 20, 1953, and before the Texas Industrial Commission at Austin, Texas on December 4, 1953. Subsequent to the testimony at the trial he swore, on July 12, 1954, before the House Committee on Un-American activities that he had not lied in the testimony given at the trial and on the occasions mentioned above. It is worthy of note that, in the hearing before the Senate Internal Security Sub-Committee, Matusow testified in the presence of appellant that appellant was a Communist Party member, and that his union, the International Union of Mine, Mill and Smelter Workers, was planning to cut off copper production for the Korean War by a strike. Appellant was asked by the Senate Committee if he denied the charges made by Matusow and appellant declined to answer, claiming his constitutional privilege against self-incrimination.

On October 22, 1954, Matusow told a representative of the press that he had never lied under oath, and he made a like statement to representatives of the Department of Justice in October, 1954.

(7) Under these circumstances the court below was justified in finding that Matusow testified truthfully at the trial, and that his recantation was false; in fact it is difficult to perceive how the court could have reached any other conclusion. Appellant relies heavily upon the decision of the District Court of the United States for the Southern District of New York in United States v. Flynn, 130 F.Supp. 412, appeal discontinued Sept. 14, 1955 on stipulation. That court rendered a lengthy opinion which we have read with care. We are not called upon to pass on the decision of the fact-finder in that case. The facts attending that trial and those adduced at the hearing of the motion for a new trial were different from those here. Nor was the court faced there with the inducement to a false recantation which stands out so prominently here. The holding of the District Judge there has no tendency to persuade us that we should overturn the decision on the facts made by the District Judge in the case before us. In any event, we are not tempted to succumb to the thesis that there is no truth because the search for it is made difficult or complex by the machinations of evil men.

(8) There is another point of difference between the situations faced respectively by the District Judge in the Flynn case and the court below in this case. In the Flynn case, Matusow's testimony was so vital and uncorroborated with respect to the two defendants granted new trials that the court felt that they would not have been convicted without it. Here the situation was quite different, the testimony of Matusow in most of its fundamental aspects being merely cumulative, and the facts being established by credible testimony from other witnesses. What he said concerning appellant's activities in the National Association of Mexican-Americans, commonly referred to as ANMA, furnishes a good illustration. Matusow's testimony at the trial had connected appellant with that organization of Mexican and American miners and had characterized the organization as Communist dominated. By degrees Matusow recanted the substance of that testimony. But other witnesses established the same facts to which Matusow had testified, and which he sought to recant. Witnesses Ford and Petersen established definitely that ANMA had long been an important concentration point in the work of the Communist Party in New Mexico. Ford and Terrazas corroborated Matusow's partly recanted testimony of appellant's admitted activity in the organization, and no facet of that proof was left without convincing corroboration.

Other witnesses gave in detail the names of persons participating in the activities Matusow attributed to appellant, and none of these were used by appellant at the trial or on the hearing to challenge or refute any of this testimony. In most instances others were present when appellant made the statements ascribed to him by Matusow; and the

**560**

testimony given by Matusow as to conversations between him and appellant alone dealt with situations covered by testimony of other witnesses. The burden was on appellant to bring forward witnesses to refute the otherwise undisputed testimony or at least to give a satisfactory explanation of his failure to do so.

■ There was ample evidence before the jury at the trial to warrant a conviction without the testimony of Matusow. We hold that, upon the whole record, it is manifest that the testimony without Matusow was so convincing that it is difficult to justify the thought that any other result could have been reached if Matusow had not been present as a witness.

(9) Appellant repeats the argument that the court below erred in refusing to require that the F.B.I. reports be brought before it, the complaint this time being based largely upon the refusal of the judge to require disclosure of a report written by an agent after Matusow had expressed a desire not to testify in any future hearing of the prosecution against appellant. The request with which we are dealing was raised after Matusow had stated that he had indicated to the F.B.I. agent that his testimony was not honest.[11] That request made by appellant's attorney was not made when the testimony was given but quite a bit. later. When the quoted testimony was brought out, Matusow was under cross-examination about divorce proceedings. between him and his wife.

The agent gave quite a different version of what Matusow said to him.[12] The situation facing the judge at the hearing does not come within the holding of the Supreme Court in the case relied upon, Gordon v. United States, 344 U.S. 414, 73 S.Ct. 369, 374, 97 L.Ed. 447. There appellant's conviction rested upon the testimony of one witness alone, an accomplice who had entered a plea of guilty, and his sentence had been deferred by the trial judge, who stated to the witness that he should tell the Government officers all that he knew with the obvious expectation that he might receive a " 'recommendation for a lenient. sentence or for probation' ". Moreover, it was established without contradiction that the witness had given the F.B.I. a. statement in direct contradiction to the one he was then making. On the basis of rejection of the request for that statement, plus the error committed by the

---

11. He made two statements while under cross-examination, the former being: "I told the F.B.I. agent I didn't want to testify in the Jencks trial. I didn't feel my testimony was honest. Or, in substance, that is what I told him—I didn't want to ever testify and especially in the Jencks trial that was coming up." A little later on the same subject he stated: "I told the agent and he made a written notation of what I was saying about the Jencks case and I asked him if he would forward that information to Washington or to whoever was in charge of the Jencks case to inform them I didn't want to be a witness in that case. That is how it happened and he took it down and asked me to look at his note. I looked at his notes and said, 'Yes'."

12. "Mr. Matusow came into the resident agency * * * and indicated he was about to accept work at a radio station, KTRC, and that he had been having marital trouble, that he was in Santa Fe at that time with his divorced wife with the anticipation of marrying again, bringing about a reconciliation. He said he would like to be spared the necessity of testifying again, because the publicity that he had received seemed to work against his marital relations, he ascribed it to the publicity, and he desired that officials of the Government be notified that he would like to be spared the necessity of testifying again."

When asked whether Matusow indicated that he was not being honest in any of the testimony or that he had given any false testimony at any time or place,. the agent answered categorically, "He did, at no time, indicate to me that he had testified falsely or dishonestly".

Moreover, other testimony given by Matusow gave substance to the assumption that, what he meant when he stated to the agent that he did not feel that his testimony was honest, was that it was not honest for him to associate intimately with appellant and then testify to what transpired between the two.

judge while deferring the sentence, the Supreme Court held that a conviction should be reversed. But the basis of the holding on this phase of the case is thus stated by the Supreme Court: "By proper cross-examination, defense counsel laid a foundation for his demand by showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, were contradictory of his present testimony, and that the contradiction was as to relevant, important and material matters which directly bore on the main issue being tried". 344 U.S. at page 418, 73 S.Ct. at page 373.

■ The situation with which the court below was dealing was not like the one described in this quotation. The vague hint of dishonesty was supported only by Matusow's statement, and his testimony was directly contradicted by the F.B.I. agent. The court below was not forced to accept Matusow's statement, but was justified in accepting the contradictory statement of the agent.[13] The point has no more validity here than it had when raised at the trial.

(10) The Government is frequently compelled to look to the criminal element including accomplices for its witnesses. The enforcement of the criminal laws would be rendered impotent if convictions should be set aside merely because one of such witnesses essays to repudiate his testimony when it seems profitable to do so. Particularly is this true here where the recantation was so completely under the sponsorship and tutelage of appellant and his agents. Such a shackling of law enforcement cannot be tolerated if justice is to be preserved and organized society is to be permitted to compete on equal terms with those who would destroy it.

The action of the court below in denying the motion for a new trial was right and its judgment is

Affirmed.

---

13. Moreover, Matusow's statement was not that of a witness against appellant developed upon cross-examination, but was the statement of appellant's witness seeking to bolster testimony then being given. What we said in Shelton v. United States, 5 Cir., 1953, 205 F.2d 806, 814–815, applying the rule of Gordon v. United States, supra, applies here: "Unfortunately for the appellant, he does not claim * * * that Reid's statement of May 1, 1952, conflicted with the statement made upon the stand. On the contrary, the record shows that the defendant claimed only that the statement which was in substance the same that Reid was making on the stand was in contradiction of earlier oral statements made by him or his earlier action in not incriminating the defendant * * *."