**Benjamin INDIVIGLIO, Rose Diaz, Veto Giordenello, Anthony Phillip Kolm and Daniel William Mitchell, Appellants,**

**v.**

**UNITED STATES of America, Appellee.**

**No. 16440.**

United States Court of Appeals Fifth Circuit.

Oct. 31, 1957.

Petitions for Rehearing and Motion for Rehearing En Banc Denied Dec. 5, 1957.

Clyde Woody, William F. Walsh, Bernard A. Golding, Charles W. Gill, Houston, Tex., for appellants.

Gordon J. Kroll, Asst. U. S. Atty., Malcolm R. Wilkey, U. S. Atty., Houston, Tex., for appellee.

Before RIVES and CAMERON, Circuit Judges, and DAWKINS, Sr., District Judge.

CAMERON, Circuit Judge.

The indictment charged that the four appellants conspired with six others also indicted, with four named co-conspirators not indicted, and with other persons to the Grand Jury unknown in violation of § 7237(a), Title 26 U.S.C.A., to commit various offenses against the United States having to do with the possession, importation, purchase, sale and distribution of marijuana, heroin, and other narcotics. Thirty-six overt acts were charged in the conspiracy alleged to have continued from January 1, 1955 to June 3, 1956. The trial extended over about three weeks, and resulted in the conviction of all of the defendants. These four have appealed.

■ We have carefully read the record of more than 1300 pages and we entertain no doubt as to the sufficiency of the evidence to sustain the conviction of each of the appellants for the conspiracy charged, within the tests laid down in Direct Sales Co. v. United States, 1943, 319 U.S. 703, 63 S.Ct. 1265, 87 L.Ed. 1674; Delli Paoli v. United States, 1957, 352 U.S. 232, 236, 77 S.Ct. 294, 1 L.Ed.2d 278; and Glasser v. United States, 1942, 315 U.S. 60, 80, 62 S.Ct. 457, 86 L.Ed. 680.

■ The appellants, other than Giordenello, have no standing to object to the admissibility of the evidence obtained by the search ruled on by this Court (Judge Rives dissenting) in Giordenello v. United States, 5 Cir., 1957, 241 F.2d 575.[1] The records of various long distance telephone calls were admissible as circumstantial evidence.[2] The acts of one or more of the co-conspirators, committed after the arrests of certain of the defendants, stand upon a different footing from declarations of co-conspirators, and were relevant as additional proof of the conspiracy.[3]

We find no reversible error, therefore, in these rulings of the trial court or the others discussed in the briefs. All of the appellants assign as error the denial by the court below of a motion seeking to compel the Government to turn over to them a written statement taken by the Government from one of its witnesses used at the trial. The argument is based upon the decision of the United States Supreme Court in Jencks v. United States, June 3, 1957, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103.[4] The ma-

1. Goldstein v. United States, 1942, 316 U.S. 114, 121, 62 S.Ct. 1000, 86 L.Ed. 1312; Shurman v. United States, 5 Cir., 1955, 219 F.2d 282, 288; Cantrell v. United States, 5 Cir., 1926, 15 F.2d 953, 954; 20 Am.Jur., Evidence, § 395; cases collected in Note 285 to the text of the fourth amendment in U.S.C.A.

2. Reynolds v. United States, 1955, 225 F. 2d 123, 131, 132, and cases there collected; see, also, Ritter v. United States, 10 Cir., 1956, 230 F.2d 324, 327.

3. Abbate v. United States, 5 Cir., 247 F.2d 410, citing Lutwak v. United States, 1953, 344 U.S. 604, 617, 73 S.Ct. 481, 97 L.Ed. 593; Eldredge v. United States, 10 Cir., 1932, 62 F.2d 449, 451.

4. The trial in the case before us was concluded Oct. 25, 1956, the decision of this Court in the Jencks case was rendered Oct. 26, 1955, 226 F.2d 540, and the Supreme Court decision in Jencks was announced a few days after the present case was submitted in oral argument. In a supplemental brief, one of the appellants stated their position thus:

jority of this Court is of the opinion that, under the facts of this case, the court below did not commit reversible error in denying access to the statement.

## I.

The point presented to the trial court arose in this way. Adams, a government witness who had given a written statement to Narcotics Agent Finley, was under cross-examination by Attorney Walsh, who represented Rodney H. Peevey, a defendant who was convicted but who did not appeal. The entire evidential basis for the contention of appellants consists of one question by Attorney Walsh concerning that statement, relating solely to the alleged secreting of heroin by him in Peevey's home, and one answer by witness Adams:

"Q. And isn't it true that in that statement you said that the transaction regarding the heroin occurred on Keller Street, rather than on Lawndale? A. No, sir."

The jury having retired, Attorney Walsh made an oral motion in these words:

"Now, your Honor, at this time I ask that the Government be directed to produce for inspection by counsel the statement in question made to Mr. Finley on or about the middle of February, for purposes of cross-examination of this witness. I would like further to request the court to direct the United States Attorney to make available to the defense the minutes of the grand jury, to the extent, at least, that they deal with the transaction on Lawndale, to which this witness has now testified."

After brief argument, the Court stated: "Overrule the objection."

Attorney Walsh promptly noted an exception and, after further exchange of views Attorney Golding stated: "My defendant, Indiviglio, invokes a specific exception to the ruling." Thereupon Attorney Woody stated: "For the defendants whom I represent, Mr. and Mrs. Giordenello and Mrs. LaPorte, we join Counsel Walsh in his request * * *."[5]

There is no testimony in the record tending to contradict the quoted reply made by Adams on the witness stand, or to prove that this secreting of heroin by Peevey was on Keller Street instead of on Lawndale Street. The arguments made by appellant's attorney to support this oral request for an order to inspect the Finley statement, as well as appellants' briefs before us, are that the testimony of Adams was contradictory of one of the overt acts charged in the indictment.[6] It was undisputed that

"Five days after oral argument in this case, the United States Supreme Court decided that a defendant on trial was entitled to inspect statements made by government witnesses. * * *

"This, of course, was the precise issue raised by the third error specified in this appellant's brief * * * The Jencks opinion clearly establishes that the denial of appellant's demand for inspection of the statement of Robert C. 'Mop' Adams was prejudicial and reversible error."

Appellants have not taken the position that decision of the present case is governed by the statute enacted in the closing days of the last session of Congress, 71 Stat. 595, 18 U.S.C.A. § 3500, approved Sept. 2, 1957. (Appellant Giordenello refers to the statute in his supplemental brief and asserts that he was "fully entitled to the Adams statement, even applying the restrictive policies of the new statute." At the same time, he argued "that the restrictions which the statute places on the Jencks doctrine violated defendant's constitutional rights to have compulsory process to obtain evidence, and to enjoy due process of law."

The applicability of the new statute is not presented to us and is not considered by us.

5. It does not appear that appellant Kolm joined in the request.

6. "[Overt Act] 22. On or about January 26, 1956, in the vicinity of Houston, Texas, Robert C. Adams concealed a quantity of Heroin in Rodney H. Peevey's home on Keller Street in Houston, Texas, said concealment occurred with the knowledge and consent of Rodney H. Peevey."

Adams did not testify before the Grand Jury and this allegation in the indictment would not have the effect of giving rise to a contradiction of the testimony of witness Adams.

■ At all events, Peevey did not appeal from the judgment of conviction, and the question which provoked the request for Adams' statement to the Narcotic Agent did not relate to any of the appellants who are parties to the appeal. It is apparent, therefore, that the record contains no evidence tending to support the implications contained in the question of Attorney Walsh, or to contradict or impeach the statement of the witness Adams; and it is the universal rule that a witness may not be impeached as to matters not material.[7]

The question before us for decision, therefore, is this: Whether the Court below *abused its discretion* in denying access to the Adams statement, and whether such action was shown to be sufficiently material and prejudicial to appellants to require reversal.

■ Appellants recognized in their brief and argument before us the necessity of showing as a predicate for the demand, the materiality of the statement as furnishing contradictory evidence. The quotation in the margin is taken from the "Brief for Appellants:"[8] Sitting as we do as an appellate court, we are justified in finding error in the actions of the trial court only with respect to matters presented to that court, and limited to the contentions made to it as the basis for the requested action.

## II.

We are dealing here essentially with the claimed right of discovery. This arises when, in adversary litigation, one party seeks to enforce an entry into the file of the other litigant for the purpose of obtaining a statement taken by the second litigant in preparation for trial.[9] It is well to take our bearings to discover the state of the law which faced the lower court when the motion to compel production of the Adams statement was made.

■ (a) Discovery is governed, both in criminal and civil cases, by rules of practice promulgated by the Supreme Court under congressional authority.[10]

---

7. Several days after the foregoing motion was made, the court below wrote the word "Denied" upon a request addressed to the clerk of the court by appellants for the issuance of a subpoena duces tecum for William Thomas Finley, Enforcement Agent. For the reasons hereinafter set out the rights claimed by appellants were not thereby enlarged.

8. "It was definitely shown that the statement was in existence and in possession of the appellee, through cross-examination of appellants' witness, Adams. Had the statement, as requested, been produced, *it is apparent that material contradictions would have prevailed insofar as this witness was concerned.* Clearly it was error not to require and to order appellee to produce the statement in question. Gordon v. United States, 344 U.S. 414 [73 S.Ct. 369, 97 L.Ed. 447]; United States v. Krulewitch [2 Cir.,], 145 F.2d 76, 79 [156 A.L.R. 337]; United States v. Beekman, [2 Cir.,], 155 F. 2d 580, 584 * * *." [Emphasis supplied.]

In the reply brief filed by appellants

Indiviglio and Diaz the argument for production of the Adams statement was limited to prayer for its production for the inspection of the trial judge,—a wholly different request from that made in the motion upon which the appeal is predicated. Here is the statement made in the reply brief of these appellants: "It would have been a very simple matter for the court to have called upon the Government to produce it for inspection by the trial judge when request was demanded by attorneys for appellant. If the statement did establish contradictions and variances, in the interest of justice the trial court should have required the Government to permit appellants' counsel to inspect the same."

9. Except where constitutional rights are claimed, the Government is entitled to exactly the same treatment as any other litigant.

10. By the Act of June 29, 1940, 54 Stat. 688, now 18 U.S.C.A. § 3771, the Supreme Court was empowered by Congress to pass rules governing practice in the District Courts, and it promulgated them

The power conferred on the Supreme Court by the statute was in these words:

> "The Supreme Court of the United States shall have the power to prescribe, from time to time, rules of pleading, practice, and procedure with respect to any or all proceedings prior to and including verdict, or finding of guilty or not guilty by the court * * * in criminal cases * * * in district courts of the United States * * *. Such rules shall not take effect until they shall have been reported to Congress by the Attorney General at the beginning of a regular session thereof and until after the close of such session, and thereafter all laws ·in conflict therewith shall be of no further force and effect."

Fed.Rules Crim.Proc. rule 16, 18 U.S.C.A. is the only one dealing with the subject and reads as follows:

> *"Rule 16 Discovery and Inspection*
> "Upon motion of a defendant at any time after the filing of the indictment or information, the court may order the attorney for the government to permit the defendant to inspect and copy or photograph designated books, papers, documents or tangible objects, obtained from or belonging to the defendant or obtained from others by seizure or by process, upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable. * * *"

The Advisory Committee's note under this rule states: "Whether under existing law discovery may be permitted in criminal cases is doubtful * * *. *The entire matter is left within the discretion of the court.*" [Emphasis added.] Since there is no evidence that the statement of Adams was obtained "by seizure or by process," it is obvious that the

rule does not literally cover the situation with which we are dealing. But the principle of discovery and inspection, whenever allowed, is established by the Rule and includes these ingredients: There must be a showing that the items sought "may be material to the preparation of his defense and that the request is reasonable." The Advisory Committee's note makes it clear that the sufficiency of that showing shall be within the discretion of the District Court.

(b) In the same year Congress passed the Act under which the rules were promulgated and shortly before the Committee and the Supreme Court collaborated in their preparation, fresh in their minds was the long-pending and much-publicized case of United States v. Socony-Vacuum Oil Co., (argued Feb. 5th and decided May 6, 1940) 310 U.S. 150, 60 S.Ct. 811, 84 L.Ed. 1129. What the Supreme Court there decided was the then existing law with respect to requiring the Government to permit the defendant to inspect statements taken from witnesses and it applies exactly to the situation now before us except in two respects: (1) the prior statement of the witnesses was made before the grand jury (but no question of privilege was raised, discussed, or decided), and (2) the statements had, during direct examination by the Government attorney, been read to ·the witnesses to refresh their recollection, but they had not been exhibited to the witnesses. In both respects, there was a stronger showing for requiring the Government to permit inspection of the statements used than in the case before us.

In Socony the Government used the grand jury to refresh the memories of its witnesses ninety times, involving reading to them more than one thousand lines of previous testimony, which revealed about fifteen inconsistencies between what was read and their testimony on the stand. The trial court

on Dec. 26, 1944 and they became effective on March 21, 1946. The Court had appointed an Advisory Committee headed by the late Arthur T. Vanderbilt,

then Chief Justice of the Supreme Court of New Jersey, to draft the rules, and the Committee contained lawyers of eminence and distinction.

refused, in every instance, to permit defense counsel to inspect any part of the transcript which was being used in open court to refresh the recollection of the witnesses, and the Court of Appeals reversed. But the Supreme Court set aside its action and affirmed that of the District Court. Some of its language is applicable here, as it logically influenced Congress in its empowering the Supreme Court to formulate rules for the District Courts, and the Advisory Committee and the Supreme Court in working them out:

"* * * Such use of grand jury testimony for the purpose of refreshing the recollection of a witness *rests in the sound discretion of the trial judge.* [Citing cases.] He sees the witness, can appraise his hostility, recalcitrance, and evasiveness or his need for some refreshing material, and can determine whether or not under all the circumstances the use of grand jury minutes is necessary or appropriate for refreshing his recollection. As once stated by Judge Hough, 'The bald fact that the memory refreshing words are found in the records of a grand jury is not a valid objection.' * * * *No iron-clad rule requires that opposing counsel be shown the grand jury transcript where it is not shown the witness and where some appropriate procedure is adopted to prevent its improper use. That again is a matter which rests in the sound discretion of the court.*

"Since there is no inexorable rule which under all circumstances entitles the witness and his counsel to see the prior statement made under oath and since in this case the court itself examined and thus directly controlled the use of the grand jury testimony, we cannot say that the refusal to make it available to counsel for the defense is per se reversible error. *To hold that it was error in the instances here under review would be to find abuse of discretion,* where in fact we conclude from the entire record on this phase of the case that the judge supervised the procedure with commendable fairness. In sum, the selective use of this testimony and the precaution taken by the trial judge made it impossible for us to say that he *transcended the limits of sound discretion* in permitting it to be used by the government without making it available to the defense. * * *

"In addition, it clearly appears that the *use of this material was not prejudicial.* So far as the subject matter of the inquiry is concerned, that prior testimony was either cumulative or dealt only *with the minutiae of* the conspiracy. The record minus that testimony clearly establishes all the facts necessary for proof of the illegal conspiracy. No portion of it was dependent on *the minor facts* concerning which the memory of these witnesses was refreshed. Hence, the situation is vastly different from those cases where *essential ingredients of the crime were dependent on testimony elicited* in that manner or where the evidence of guilt hung in delicate balance if that testimony was deleted." 310 U.S. at pages 233, 234, 235, 60 S.Ct. at page 849. [Emphasis added.]

During the period following the grant of power by Congress to the Supreme Court to formulate criminal rules, and while the process was in full operation, the Supreme Court, on April 27, 1942, rendered another decision declaratory of the law of discovery at the time the rules were promulgated and adopted, Goldman v. United States, 316 U.S. 129, 62 S.Ct. 993, 995, 86 L.Ed. 1322. A conspiracy indictment had been returned against Goldman based largely on testimony given by Government agents of what they had heard, by means of a detectaphone, of a conference in a co-conspirator's office.[11] The Government

11. Both Goldman and the co-conspirator were lawyers.

agents admitted that they had refreshed their recollection from notes made by them of what transpired in the lawyer's office. At a preliminary hearing and at the trial Goldman demanded the right to inspect the notes, from which the witnesses had refreshed their recollection. The trial court refused the right and the Supreme Court affirmed, using this language:

"We hold there was no error in denying the inspection of the witnesses' memoranda. The judge was clearly right in his ruling at the preliminary hearing, as the petitioners should not have had access, prior to trial, to material constituting a substantial portion of the Government's case.

"We think it the better rule that *where a witness does not use his notes or memoranda in court,* a party has no absolute right to have them produced and to inspect them. Where, as here, they are not only the witness' notes but are also part of ·the Government's files, *a large discretion must be allowed the trial judge. We are unwilling to hold that the discretion was abused in this case.*" [Emphasis supplied.]

■ (c) As stated above, Rule 16 was intended primarily to cover discovery and inspection before the beginning of the trial. But it is generally accepted that its civil counterpart (Fed.Rules of Civil Procedure Rule 34, 28 U.S.C.A.), couched in similar language—neither providing any time limit—may be utilized during the course of the trial, 4 Moore's Federal Practice, Second Edition, pp. 2440, et seq., United States v. Smith, 9 Cir., 1941, 117 F.2d 911. There is every reason to

hold the same thing with respect to Rule 16. The discretion of the trial judge controls all such questions. Whenever inspection of documents in the adversary's file is requested, the trial court will allow it only under the limitations of materiality and reasonableness provided in the Rule.

■ (d) It is plain that the Supreme Court derived its sole rule-making power from the statute and that it could not modify or add to the provisions of any rule, except by following the procedure therein provided.

■ (e) The right to discovery and inspection under the Criminal Rules ought to be judged against the background of the Federal Rules of Civil Procedure, adopted eight years earlier, and the experience and decisions under them. The Supreme Court [12] pointed out that Rule 16 of Criminal Procedure was modeled upon Rule 34 governing civil procedure.[13] The language of Criminal Rule 16 follows closely the language of the quoted Civil Rule and the last sentences of the two Rules are identical.[14]

■ The right of discovery under the Civil Rules is limited to cases where parties have shown good cause for the order, while the right in criminal cases is limited by the clause, "Upon a showing that the items sought may be material to the preparation of his defense and that the request is reasonable." Access to statements of witnesses placed on the stand by a litigant has always been considered as governed by the discovery rule, and the Supreme Court first dealt with the subject in Palmer v. Hoffman, 1943, 318 U.S. 109, 116, 63 S.Ct. 477, 482, 87 L.Ed. 645.

---

12. Hickman v. Taylor, 329 U.S. 495, 67 S.Ct. 385, 91 L.Ed. 451.

13. "Upon motion of any party showing good cause therefor and upon notice to all other parties * * * the court in which an action is pending may (1) order any party to produce and permit the inspection and copying or photographing, by or on behalf of the moving party, of any designated documents, papers, books, accounts, letters, photographs, objects, or tangible things, not privileged, which constitute or contain evidence relating to any of the matters within the scope of the examination permitted by Rule 26(b) and which are in his possession, custody, or control * * *."

14. The more restricted scope of the Criminal Rule will be discussed infra.

One of Hoffman's witnesses testified on cross-examination that he had given him a signed statement, and Palmer's counsel asked to see it. The trial court offered to compel the production, but only upon condition that this would open the door for Hoffman to offer the statement in evidence. Palmer's counsel declined, and assigned as error that the court below had, under Rules 26(b) and 34 of Civil Procedure, committed error in declining to *permit unconditional inspection* of the statement. The Supreme Court declined to consider the assignment and, through Mr. Justice Douglas speaking for a unanimous court, used this language:

"Since the document was not marked for identification and is not a part of the record, we do not know what its contents are. It is therefore impossible, as stated by the court below, to determine whether the statement *contained remarks which might serve to impeach the witness. Accordingly, we cannot say that the ruling was prejudicial even if we assume it was erroneous.* Mere 'technical errors' which do not 'affect the substantial rights of the parties' are not sufficient to set aside a jury verdict in an appellate court. 40 Stat. 1181, 28 U.S.C. § 391, 28 U.S.C.A. 391. He who seeks to have a judgment set aside because of an erroneous ruling *carries the burden of showing that prejudice resulted.* That burden has not been maintained by petitioners." [Emphasis added.]

In Hickman v. Taylor, supra,[15] Mr. Justice Murphy, speaking also for a unanimous court, noted the widespread controversy among members of the legal profession over the problem there presented, adverted to the very restricted discovery permitted by the English courts,[16] and held that Rule 34 and the other Rules of Civil Procedure involved *did not permit inspection by the adverse party as a matter of right,* but required a showing of good cause sufficient to warrant the trial court in using its discretion to permit inspection. In a specially concurring opinion Mr. Justice Jackson, joined in by Mr. Justice Frankfurter, used this language:

"Counsel for the petitioner * * * bases his claim to it in his brief on the view that the Rules were to do away with the old situation where a lawsuit developed into 'a battle of wits between counsel.' But a common law trial is and always should be an adversary proceeding. Discovery was hardly intended to enable a learned profession to perform its functions either without wits or on wits borrowed from the adversary. * * * All such procedural measures have a background of custom and practice which was assumed by those who wrote and should be by those who apply them. * * * The question remains as to signed statements or those written by witnesses. * * * Production of such statements are governed by Rule 34 and on 'Showing good cause therefor' the court may order their inspection, copying or photographing. No such application has here been made; the demand is *made on the basis of right, not on showing of cause.* * * *" 329 U.S. at pages 516, 518, 67 S.Ct. at page 396. [Emphasis added.]

Palmer v. Hoffman was written shortly before the Supreme Court filed with Congress the Federal Rules of Criminal Procedure, and Hickman v. Taylor was written immediately after their filing, and both were a part of the evolution in

15. Argued Nov. 13, 1946, decided Jan. 13, 1947.

16. Quoting from Odgers on Pleading and Practice 12 Edition, 1939, page 264, and referring to a compilation of English cases in 8 Wigmore on Evidence, 3rd Edition, 1940, pages 618-622. For a further discussion of the historical development of discovery and inspection, see, also, United States v. Bowman Dairy Co., 7 Cir., 1950, 185 F.2d 159.

558

procedure which had been initiated by William Howard Taft a half century ago,[17] which included collaboration by lawyers, the Supreme Court, and Congress.

Discovery and inspection under the Civil Rules have always been conceded to be broader than under the Criminal Rules. "Under the Federal Rules of Civil Procedure, utmost liberality of discovery was envisaged and prescribed. Liberal discovery was, however, deemed unsuitable in criminal cases. It cannot be had as against the defendant without encroaching on his rights under the Fourth and Fifth Amendments. Likewise, it seemed unwise and inexpedient as a matter of policy to allow broad and unbridled discovery as against the Government. With this thought in mind, the Advisory Committee limited discovery in behalf of the defendant to such documents [as were made relevant and admissible] * * * upon a showing that the items were material to the preparation of the defense and that the request was reasonable."[18]

(f) The pre-Jencks history of the right in criminal cases of discovery and inspection includes two decisions rendered by the Supreme Court since passage of the Federal Criminal Rules.[19] In Bowman Dairy a motion had been filed under Rule 16 for inspection of certain books, papers and documents, and the Government agreed to an order and furnished those documents. Thereupon Bowman served on the Government attorneys a subpoena duces tecum calling for other documents, including narrative statements of witnesses and other writings not obtained by seizure or process. The Government moved to quash the subpoena on the ground that writings in its custody could be obtained only under Rule 16. The motion was denied, the Government attorney refused to comply with the court's order and was held in contempt. The Court of Appeals for the Seventh Circuit reversed, holding that Rule 17 did not entitle a defendant to any broader discovery than that permitted under Rule 16.[20]

The Supreme Court vacated the judgment of the Court of Appeals and remanded the case for trial under its holding that the scope of materials which could be reached by subpoena was broader than under discovery provided by Rule 16.[21] This language from the opinion sheds light on the problem before us:

"It was not intended by Rule 16 to give a limited right of discovery, and then by Rule 17 to give a right of discovery in the broadest terms.

17. See "A Criminal Case In The Federal Courts" by Alexander Holtzoff, 1955 Federal Rules of Criminal Procedure (West), page 1.

18. "A Criminal Case In The Federal Courts," by Alexander Holtzoff, West Publishing Company, 1955 Federal Rules of Criminal Procedure, at page 12.
And the Supreme Court, in the Gordon case, infra at page 419, of 344 U.S., footnote 9, at page 373 of 73 S.Ct., noted that the discovery provisions of the Federal Rules of Civil Procedure were broader than those of the Federal Rules of Criminal Procedure.

19. Bowman Dairy Co. v. United States, 1951, 341 U.S. 214, 71 S.Ct. 675, 95 L.Ed. 879, and Gordon v. United States, 1953, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447.

20. United States v. Bowman Dairy Co., 185 F.2d 159, 163: "Considering the history of Rule 16, which shows the evolution from the broad terms of its first draft to its final restrictive and limited terms, it is difficult to believe that the framers of the rule intended to authorize discovery and inspection of broad scope under Rule 17(c) pertaining to subpoena which was expressly prohibited by Rule 16 which is the rule intended to cover discovery and inspection." [Emphasis added.]

21. The Court was careful to point out that "Where the court concludes that such materials ought to be produced, it should, of course, be solicitous to protect against disclosures of the identity of informants, and the method, manner and circumstances of the Government's acquisition of the materials."
The attorney who refused to produce the documents called for in the subpoena was purged of contempt because the subpoena was too broad, and it had to be judged "in its entirety."

\* \* \* *Rule 17(c) was not intended to provide an additional means of discovery.* Its chief innovation was to expedite the trial by providing a time and place *before trial* for the inspection of the subpoenaed materials. \* \* \* There was no intention to exclude from the reach of process of the defendant any material that had been used before the grand jury or could be used at the trial. In short, any document or other materials, admissible as evidence, obtained by the Government by solicitation or voluntarily from third persons is subject to subpoena."[22] [Emphasis added.]

Gordon involved a case where conviction was had largely on the testimony of one Marshall, an accomplice. On cross-examination Marshall admitted that he had given three or more statements to the FBI in which he did not implicate Gordon. The defendant thereupon asked the court to compel the production of those statements and also a transcript of proceedings had before the trial judge, who had held up the sentence under circumstances which would probably have warranted the jury in finding that Marshall had received at least tacit assurance of immunity. The requests were denied, and the Court of Appeals for the Seventh Circuit affirmed.[23] Practically the entire battle before the Court of Appeals revolved around whether the statements and the court records would be admissible if produced. That Court mentioned Rule 17(c), providing for subpoena duces tecum, but did not mention Rule 16,

and concluded that, since Marshall had admitted on cross-examination everything which could have been shown by the records demanded, it was not an abuse of discretion for the court below to deny access to and use of these records.

The Supreme Court reversed in a decision based, in large measure, on whether the records would be admissible; and pointing out that the *Government apparently conceded that the Court below ought to have compelled production if the records constituted admissible evidence.* The Supreme Court dealt with the question before it as one of evidence to be solved by applying Criminal Rule 26,[24] and did not mention Rule 16.

The language of the opinion (344 U.S. at pages 418–419, 73 S.Ct. at page 372) shows clearly that the Court was not intending to deal further with the matter of discovery and inspection, but to base its holding upon the rules of evidence *under the Government's concession:*

"Apparently, earlier common law did not permit the accused to require production of such documents. Some state jurisdictions still recognize no comprehensive right to see documents in the hands of the prosecution merely because they might aid in the preparation or preservation of the defense. *We need not consider such broad doctrines in order to resolve this case, which deals with a limited and definite category of documents to which the holdings of this opinion are likewise confined.*[25]

---

22. At pages 220–221 of 341 U.S., at page 679 of 71 S.Ct.

23. United States v. Gordon, 1952, 196 F. 2d 886.

24. "In all trials the testimony of witnesses shall be taken orally in open court \* \* \*. *The admissibility of evidence and the competency and privilege of witnesses* shall be governed, except when an act of Congress or these rules otherwise provide, by the principles of the common law as they may be interpreted by the courts of the United States in the

light of reason and experience." [Emphasis added.]

Latitude is explicitly given to the Supreme Court in determining "the admissibility of evidence and the competency and privileges of witnesses." But the right to compel inspection must be exercised within the limitations fixed by the Rule—the only Rule as shown from quotations above—creating the right of discovery as one not theretofore existing.

25. The limited and definite category of documents to which the Gordon opinion

"By proper cross-examination, defense counsel laid a foundation for his demand by showing that the documents were in existence, were in possession of the Government, were made by the Government's witness under examination, *were contradictory of his present testimony,* and that the contradiction was as to relevant, *important and material matters* which directly bore on the main issue being tried: the participation of the accused in the crime. * * * In the light of our reason and experience, the better rule is that *upon the foundation that was laid* the court should have overruled the objections which the Government advanced and ordered production of the documents." [Emphasis added.]

It is clear that the Supreme Court, in Gordon, did not consider whether an accused should have access to documents merely because they *might aid in the preparation of his defense.* It held merely that the three statements which did show inconsistencies should be produced. The opinion of Mr. Justice Burton, joined in by Mr. Justice Harlan, in Jencks,[26] demonstrates that the historical rule has always been that *use* of a witness' statement should be confined to those instances where inconsistency is shown:

"Petitioner requested only that the records be produced to the trial court. He is entitled to no more. * * * But if the reports [submitted to the trial court] do not contain contradictory or exculpatory material helpful to petitioner, no possible prejudice could have re-

sulted from the trial court's denials of petitioner's motions. * * *"

In the case before us the motion demanded that the Adams statement be forthwith delivered direct to appellants without any showing of probable contradiction or of prejudice to appellants. Under Palmer v. Hoffman, supra, appellants carried the burden of showing that prejudice resulted as well as of bringing the Adams statement before us.

### III.

These principles are axiomatic and have, through the ages, guided courts of every rank and jurisdiction: "The general rule * * * is that an appellate court will consider only such questions as were raised and reserved in lower court."[27] "It is well settled that the theory upon which the case was tried in the court below must be strictly adhered to on appeal or review. Under this rule a party will not be permitted, in the appellate or reviewing court, to assume a position inconsistent with that occupied by him in the trial court with respect to the grounds or theory of recovery or relief or of defense or opposition, the nature or sufficiency of pleadings, the admissibility or sufficiency of evidence, or the burden of proof."[28]

"The general rule that an appellate court will consider only such questions as were raised in the lower court, and the rule requiring adherence to the theory pursued below, operate ordinarily to preclude the consideration, on appeal or review, of grounds of defense or of opposition not asserted and relied on in the trial court."[29] "Under the general principle requiring definiteness and particularity in the statement of the

---

was confined was three statements given the FBI by a witness who admitted that those statements did not include Gordon. In other words, the witness admitted that the statements if produced would impeach the testimony given at the trial by showing clear inconsistencies.

26. 353 U.S. 678, 77 S.Ct. 1018.

27. This text of 3 American Jurisprudence, "Appeal and Error," § 246, p. 25, is

supported by more than fifty decisions of the Supreme Court.

28. Ib. § 253, pp. 35–37. The first sentence is supported by fourteen Supreme Court cases.

29. Ib. § 287, p. 59; thirty-two Supreme Court cases are listed as supporting the text.

grounds of objections, motions, and exceptions, where the ground upon which it is claimed that testimony should have been admitted were not stated at the trial, the propriety of its exclusion will not be considered on review."[30]

It is plain, therefore, that the Supreme Court, in Jencks exercising as it was only its appellate jurisdiction, was empowered to put the trial court in error only by considering its ruling with respect to what appellant asked it to do and based on the theory relied on by appellant in presenting his motion. Appellant asked the trial court to require the Government to present to the court—not to appellant—the Matusow and Ford statements, basing his requests solely upon the assertion that he had established by proof that these statements probably contradicted the testimony given on the witness stand. The Supreme Court had the power to decide that, on the facts in evidence, the court below had abused its discretion in denying the request as it was presented at the trial. But, under these universally accepted principles, its competence did not go beyond that.

## IV.

 It is a rule of universal application by the Supreme Court, as well as the other courts of this country, that no opinion can be considered as binding authority unless the case calls for its expression.[31] American Jurisprudence [32] drew upon scores of Supreme Court decisions in its distillation of the rule to these words: "The language and general expression in an opinion of the court are to be taken in connection with the case

* * * and must be construed in the light of the issue which was in controversy in the case and which was decided * * *. They must not be extended beyond that for the purpose of authority in another and different case. In other words, to make an opinion a decision there must have been an application of the judicial mind to the precise question necessary to be determined in order to fix the rights of the parties."[33]

The rule was graphically epitomized by Mr. Justice Reed in the controlling opinion in Darr v. Burford, 339 U.S. 200, 214, 70 S.Ct. 587, 595, 94 L.Ed. 761:

"We doubt the effectiveness of a voluntary statement on a point not in issue. Compare Bowen, L. J. in Cooke v. New River Co., 38 Ch.D. 56, 70–71: '* * * like my Brothers who sit with me, I am extremely reluctant to decide anything except what is necessary for the special case, because I believe by long experience that judgment comes with far more weight and gravity when they come upon points which the Judges are bound to decide, and I believe that *obiter dicta*, like the proverbial chickens of destiny, come home to roost sooner or later in a very uncomfortable way to the Judges who have uttered them, and are a great source of embarrassment in future cases.' Cohens v. Commonwealth of Virginia, 6 Wheat. 264, 399–400, 5 L.Ed. 257; Wright v. United States, 302 U.S. 583, 593–594, 58 S.Ct. 395, 399, 82 L.Ed. 439." [34]

---

30. Ib. § 353, p. 97, citing a number of Supreme Court decisions in support. Decisions from all of the states are cited in connection with the foregoing quotation and no contrary statement has been found. And cf. our recent case holding the same thing, Matthews v. United States, 1954, 217 F.2d 409.

31. Cf. Carroll v. Carroll's Lessee, **16** How. 275, 57 U.S. 275, 14 L.Ed. 936.

32. 14 Am.Jur., Courts, § 79, p. 291 et seq.

33. See same text, § 83, p. 295: "The doctrine of stare decisis contemplates only such points as are actually involved and determined in a case, and not what is said by the court or judge outside the record or on points not necessarily involved therein." Citing a number of Supreme Court cases.

34. The quotation combines the text of the opinion with footnote 38.
The words of Mr. Justice Frankfurter, with whom Mr. Justice Black joined, dis-

## V.

In order that the decision of the Supreme Court in Jencks may be tested as to its force under *stare decisis* it is necessary to consider just what was there before the trial court and its ruling thereon. The Government's witness Matusow, a member of the Communist party in the employ of the Government, had testified that he had made a number of written and oral statements to the Government, and Jencks' attorney had sought in cross-examination to develop that those statements were inconsistent with testimony given at the trial as well as with testimony given by him before a Senate Committee. We set out in the margin a portion of what transpired to demonstrate what the Court below ruled upon, and therefore what was before the Supreme Court when it rendered the Jencks decision.[35]

The trial judge overruled both motions manifestly upon his conclusion that the requisite contradiction and inconsistency had not been shown. The entire battleground in the court below was based on this single point, and in the argument before the Court of Appeals for the Fifth Circuit the same position was maintained.

Under the authorities discussed supra, the Supreme Court had nothing before it but the question whether the trial court erred in denying the two motions based and argued solely on the predicate that a showing of inconsistency had been made; and upon their concession, based upon the law as then well established, that the statements must first be submitted to the court for its decision on relevance and materiality. The Supreme Court was without authority to go beyond the ruling of the trial court re-

senting are helpful here:

"Decisions on matters of procedure within the Court's control ought not to be like shifting sand. Quick fluctuations in them should be avoided unless a rule of practice has proven itself mischievous in practice. * * * Respect for an explicit adjudication on a matter of procedure very recently rendered after the fullest consideration, as well as the soundness of the decision, should lead us to adhere to Wade v. Mayo [334 U.S. 672, 68 S.Ct. 1270, 92 L.Ed. 1647]." 339 U.S. at page 221, 70 S.Ct. at page 599.

And see the language of Mr. Justice Jackson in Armour & Co. v. Wantock, 323 U.S. 126, 132–133, 65 S.Ct. 165, 168, 89 L.Ed. 118: "It is timely again to remind counsel that words of our opinions are to be read in the light of the facts of the case under discussion."

35. "Mr. McTernan: If the Court please, at this time, we move you for an order requiring the prosecution to produce in court the reports submitted to the FBI by this witness * * *. We ask that in doing this the following procedure be adopted: that the Court require that the reports be produced and handed to the Court for inspection. We desire those portions of the report which will contradict the witness' testimony. In view of the disparities in his testimony so far, I submit that there is a good

ground for making this examination. *We ask that those portions of the reports, which in the Court's view after reading them have an evidentiary value in this case for impeachment, be made available to us for cross-examination * * *.* What we are concerned with is *obtaining written declarations of this witness which are inconsistent with his testimony;* and we assert to the Court, on the basis of the Krulewitch case and other cases, that we have a right to obtain the witness' prior statements in order to show inconsistencies, if they exist; and a denial of this right to look at the statements would be in this case reversible error." [Emphasis added.]

The Government's attorney responded by attempting to differentiate the Krulewitch case (upon which chief reliance was based) from the one then before the trial Court, stating: "There the witness admitted on the witness stand that she had given a statement to the F.B.I. that was entirely contradictory of what she had testified to on the stand, * * * I submit here that this witness has not varied one particle from any of those other statements he has made and the statements he is making on the witness stand now."

Jencks' counsel made a like motion with respect to the statements given by Government witness Ford and based upon the same grounds.

sponding to the action it was importuned to take. Whatever branch of procedural jurisprudence should be held to control, the trial court was *possessed of discretion* to do what it did do, and the appellate court had jurisdiction only to determine *whether that discretion was abused.* There was testimony in the Jencks record from which the trial court could have found that the statements in the FBI files contradicted or were inconsistent with those made on the witness stand. The reversal of its ruling by the Supreme Court could, and must be considered as, founded upon the assumption that it felt that the trial court erred in exercising its discretion against Jencks' motion.

## VI.

The decision in Jencks, within the limits of the points actually decided, is the law of that case. But it is not the law of this case—nor the "law of the land." Mr. Justice Jackson thus defined the character of the Supreme Court's function in the American System: [36]

> "The Court also is dependent on the political branches or its powers in other vital respects. Its only irrevocable jurisdiction is original. * * * In all other cases it has

appellate jurisdiction. * * * But perhaps the most significant and least comprehended limitation upon the judicial power is that this power extends only to cases and controversies. * * * The result of the limitation is that the Court's only power is to decide lawsuits between adversary litigants. * * * Also, as an appellate court, it properly can act only on the state of facts revealed by the record made in the court below, supplemented sometimes by general information of which it may take judicial notice. * * * And when it is all over, judicial decree, however broadly worded, actually binds, in most instances, only the parties to the case. As to others, it is merely a weather vane showing which way the judicial wind is blowing—a precedent that the Court in a similar case is likely to follow. Its real weight in subsequent cases, however, will depend on many factors, such as the quality of the prevailing opinion, the strength of any dissent, the acceptance or criticism by the profession, and the experience in application of the rule." [37]

---

36. "The Supreme Court In The American System of Government," Harvard University Press, 1955. The quotation brings together several sentences from pages 11–13.

37. The unwisdom of attempting to limit stare decisis to the holding of one case as well as the difficulty in divining the direction in which that "weather vane" points is illustrated by this language from the dissenting opinion of Mr. Justice Clark, concurred in by Mr. Justice Burton, in the case of Reid v. Covert, 1957, 354 U.S. 1, 78, 77 S.Ct. 1222, 1262, 1 L.Ed.2d 1148: "Furthermore, four of my Brothers would specifically overrule and two would impair the long-recognized vitality of an old and respected precedent in our law, the case of In re Ross, 1891, 140 U.S. 453, 11 S.Ct. 897, 35 L.Ed. 581, cited by this Court with approval in many opinions and as late as 1929 by a unanimous Court in Ex parte Bakelite Corp., 279 U.S. 438, 451, 49 S.Ct. 411, 413, 73 L.Ed. 789. And, finally, the Court reverses, sets aside,

and overrules two majority opinions and judgments of this Court in these same cases, reported in 351 U.S. at page 470, 76 S.Ct. at page 886, and 351 U.S. at page 487, 76 S.Ct. at page 880, and entered on June 11, 1956, less than 12 months ago. In substitute therefor it enters no opinion whatever for the Court. It is unable to muster a majority. * * * But, worst of all, it gives no authoritative guidance as to what, if anything, the Executive or the Congress may do to remedy the distressing situation in which they now find themselves."

And the Congressional Record of Feb. 18, 1957, page 1896, reports a speech made on the floor of the United States Senate by Senator Stennis in which he lists ten Acts of Congress in the last twenty years passed "for the sole and specific purpose of reversing Federal Court opinion arrived at contrary to the intent of Congress in enacting the statutes under consideration;" and in which the Senator made the statement: " * * * the Court has also upset its own body of

The reliance of appellants on Jencks would have a firmer basis if the facts there were precisely the same as here. But clearly they are not. The Supreme Court points out that Matusow was working undercover for the Government while posing as an intimate friend of Jencks, and that he had testified for the prosecution in other cases. The Supreme Court indicates clearly that it felt that Jencks' conviction could not stand without his testimony. While, in the present case, the Government placed before the jury thirty-three witnesses and 1300 pages of testimony, and the guilt of these appellants was abundantly established without any reliance upon Adams' testimony.

Moreover, Matusow had, on a motion for a new trial, taken the stand in Jencks' behalf and attempted to imply that some of his testimony at the trial was false; and he had published a book under the title "False Witness" [38] in which that implication was further developed. In this case, the record contains no evidence at all tending to show that any testimony of Adams relating to appellants was open to the slightest question.

■ It is further clear that, under *stare decisis*, Jencks would not stand alone, but would take its place along-side of Socony, Goldman, Palmer, Hickman, Bowman, Gordon (none of which have been overruled), and would be considered merely as one case in the general body of the law developed through the ages. Whatever undiscovered power the Supreme Court may have in a given case to by-pass the universally accepted rules of appellate procedure above quoted, we have no such power. We sit as an appellate court in judgment upon the rulings of the court below as contained in the record and as based upon the theory of right claimed by appellants and presented to that court. And we must follow the established principles above discussed and as exemplified by the Supreme Court decisions listed in this paragraph, expressing the best thought of the Justices, several of whom participated in Jencks, over a period of two decades during which the Civil and Criminal Rules were adopted. We are without power to grant appellants more than they requested of the court below, or to grant relief upon a different theory from that advanced in the court below and before us.[39]

In reaching these conclusions, we have given ear to the teachings of history and tradition, weighing the facts before us

case law to the extent that judicial precedent probably means less to the Supreme Court of the United States than in any other court, State or Federal, in the country. Actually 36 cases have been specifically overruled by the Supreme Court of the United States since 1932. This is 7 more than the 29 which were overruled by the same Court during the first 142 years of its history * * *."

38. Jencks v. United States, 5 Cir., 1955, 226 F.2d 553, 558.

39. As stated in footnote 4 supra, we have not been asked to apply the new Federal statute to this case. And the fact that its terms are somewhat at variance with the conclusions here reached does not tempt us to doubt their accuracy. Nor are we influenced by the statement of the Attorney General to the Senate Sub-Committee on the Judiciary on June 28, 1957, which doubtless accounts for some of the provisions of the new stat-ute. The second paragraph of that statement reads as follows:

"The issue in the Jencks case involved the procedure under which a defendant may inspect a statement of a government witness, in order to impeach the credibility of such witness. The argument of the case centered on whether it was necessary for the defendant to establish a foundation of inconsistency between the testimony of the witness and the statement before the statement was made available to the defense. The Court held that numerous lower court cases holding such a foundation was necessary were wrong, and that statements which relate to the testimony of the witness must be made available to the defense without requiring the defense first to establish some inconsistency. We accept this principle."

No pre-Jencks law has been found which might have led the Attorney General to accept the principle. It seems logical, therefore, that the acceptance was

in the light of reason and common sense, in response to the duty resting upon us to do justice to the appellants while, at the same time, reaching a result which will tend to combat the widely expressed idea that the courts are manifesting judicial irresponsibility in their apparent efforts to "protect the big bad wolf from little Red Riding Hood." [40] In deciding what is material and reasonable (Rule 16), or in delineating what is "in the light of reason and experience" (Rule 26, assuming that it applies) we cannot fail to take account of the state of the age-old struggle between organized government and organized crime. The fair inference from this record is that the Government has at great expense turned up and convicted, by overwhelming evidence, some of the leaders of the narcotic traffic which is taking such grievous toll of the health and morals of the people particularly the youth of this land. In a recent message to the legislature, the Governor of New York stated: "The number of addicts has continued to grow. Narcotic arrests in New York City alone have risen 600 percent in the past decade; arrests of persons under twenty-one have increased 2300 percent." [41]

These appellants are entitled to all constitutional safeguards—and they do not contend that any were denied them—and to a fair trial. That they have had. The error they complain of is one relating to procedure alone. Appellants, arguing under the facts of this case for reversal, are more "concerned with the mere etiquette of trials and with the formalities and minutiae of procedure" than with the substantial merits.[42] Such matters are, under our system, entrusted to the trial court, and on appeal, its judgment should be approved unless we can say that there is a "clear showing of prejudicial abuse of discretion * * *." Michelson v. United States, 335 U.S. 469, 480, 69 S.Ct. 213, 221, 93 L.Ed. 168. To do this here we would be compelled to hold that as a matter of law appellants were wrongfully denied access to the Adams statement and that as a matter of law they were prejudiced by failure to produce it. It is our view that the court below did not abuse its discretion.[43]

Moreover, it is clear that appellants were not prejudiced by the challenged ruling of the trial court. We repeat what the Supreme Court said in

founded on the conclusion that it was better, in the hectic closing days of the congressional session, to make some concessions in order to be relieved of the onus of other features of the Jencks decision which led Mr. Justice Clark, former Attorney General, to say concerning the majority opinion in Jencks (353 U.S. 681–682, 77 S.Ct. 1020):

"Unless the Congress changes the rule announced by the Court today, those intelligence agencies of our Government engaged in law enforcement may as well close up shop for the Court has opened their files to the criminal and thus afforded him a Roman holiday for rummaging through confidential information as well as vital national secrets."

40. Blackstone makes the statement (3 Bl. Comm. 391) that "next to doing right, the great object in the administration of public justice should be to give public satisfaction."

Mr. Justice Cardozo used this language in Snyder v. Commonwealth of Massachusetts, 291 U.S. 97, 122, 54 S.Ct. 330, 338, 78 L.Ed. 674: "Justice, though due to the accused, is due to the accuser also. The concept of fairness must not be strained till it is narrowed to a filament. We are to keep the balance true."

41. See Shurman v. United States, 5 Cir., 233 F.2d 272, 280, and footnote 6.

42. Cf. Bihn v. United States, 328 U.S. 633, 638, 66 S.Ct. 1172, 90 L.Ed. 1485; Socony-Vacuum Oil Co. v. United States, supra, 310 U.S. at page 235, 60 S.Ct. at page 850; and Whitman, Federal Criminal Procedure, p. 398.

43. In "The Doubtful Omniscience of Appellate Courts," 41 Minnesota Law Review No. 6, page 751, Charles Alan Wright quotes from Dean Leon Green this statement: "Probably the strangest chapter in American legal history is how in the short period of the last fifty or seventy-five years, the same period during which trial courts were losing most of their power, the appellate courts have drawn unto themselves practically all the power of the judicial system."

the recent case of Lutwak v. United States, 344 U.S. 604, 619–620, 73 S.Ct. 481, 490, 97 L.Ed. 593:

"In view of the fact that this record fairly shrieks the guilt of the parties, we cannot conceive how this one admission could have possibly influenced this jury to reach an improper verdict. A defendant is entitled to a fair trial but not a perfect one. This is a proper case for the application of Rule 52(a) of the Federal Rules of Criminal Procedure.[44] We hold that the error was harmless."

Affirmed.

RIVES, Circuit Judge (dissenting).

With deference, I adhere to the views expressed in my dissenting opinion in Giordenello v. United States, 5 Cir., 1957, 241 F.2d 575, and for the reasons there stated would hold that the evidence obtained by the search of Giordenello was not admissible against him.

I think also that the present decision conflicts with the decision of the Supreme Court in Jencks v. United States, 353 U.S. 657, 77 S.Ct. 1007, 1 L.Ed.2d 1103. Robert C. Adams, a coconspirator not indicted, testified to various unlawful dealings with Giordenello and Kolm, and that Kolm described Benny Indiviglio as an Italian in New York City through whom he secured heroin from overseas, and told him that Benny had a common law wife by the name of Rose, inferably Rose Diaz alias Rose Diviglio. If believed by the jury, Adams' testimony was most damaging to each of the four appellants. Adams had signed a written statement covering all of his transactions relating to these appellants and had given it to Narcotics Agent Finley. Adams' statement was certainly in the possession of the United States, and probably under the control of the United States Attorney. The district court declined to permit the attorneys for appellants to inspect it for the purpose of cross-examining Adams. That ruling of the district court was, of course, prior to the decision by the United States Supreme Court of Jencks v. United States, 353 U.S. 657, 665, et seq., 77 S.Ct. 1007, 1 L.Ed.2d 1103. That decision, I think, should require a reversal of these judgments of conviction. I therefore respectfully dissent.

On Petition for Rehearing

PER CURIAM.

Upon considering the petitions for rehearing filed on behalf of the appellants and the motion by appellant Veto Giordenello for hearing of his petition en banc, it is ordered that said petitions and said motion be and they are hereby denied.

RIVES, Circuit Judge, dissenting.

---

44. "Any error, defect, irregularity or variance which does not affect substantial rights shall be disregarded."