Leona **HENDERSON**, Appellant,

v.

**UNITED STATES of America,**
Appellee.

No. 17225.

United States Court of Appeals
Fifth Circuit.

Dec. 23, 1958.

Rehearing Denied Jan. 27, 1959.

Cameron, Circuit Judge, dissented.

Bernard A. Golding, Houston, Tex., for appellant.

C. D. Cottingham, Jr., Asst. U. S. Atty., William B. Butler, U. S. Atty., Houston, Tex., for appellee.

Before HUTCHESON, Chief Judge, and CAMERON and BROWN, Circuit Judges.

HUTCHESON, Chief Judge.

■ Charged: in count one with the sale on November 11, 1957, to one Sutton of 74.4 grains of heroin; in count two with acquisition and concealment of the same drugs; in count three with the sale to Sutton on November 20, 1957, of 67.3 grains of heroin; and in count four with the acquisition and concealment of the said heroin on the same date; all in violation of Sec. 4705, Title 26 U.S.C. and Sec. 174, Title 21 U.S.C.A.; defendant was tried to the court without a jury and convicted on all four counts.

Appealing from the conviction, appellant is here assigning as error the denial of her motion for acquittal. In support she puts forward two grounds. The first, based upon Sherman v. United States, 356 U.S. 369, 78 S.Ct. 819, 2 L.Ed.2d 848, is that the evidence proves entrapment as matter of law. The second, based upon Adams v. United States, 5 Cir., 220 F.2d 297, is that there was no evidence from which a sale from her to Sutton, or a possession by her except for and in behalf of Sutton, could be spelled out beyond a reasonable doubt.

This is the record. The government in making out its case proceeded as it did in Panci v. United States, 5 Cir., 256 F.2d 308, without putting the informer on the stand or calling him to testify. As it did there, it disclosed that the informer, there Sansone, here Sutton, to whom it was charged appellant had made the sale, was a government special agent who had been furnished government money and instructed, if he could, to make a purchase from the defendant.

In making out this case, it relied, as it did in Panci's case, on the testimony of the narcotics agents as to their observations of meetings of the informer with the defendant.

When, therefore, the government rested, it found itself either in the position of the government in Panci's case, of

having failed to prove by sufficient evidence that the defendant had, as charged, acquired, concealed and sold the drugs in question, and a judgment of acquittal should have been entered on that ground; or, on the other hand, if its proof was sufficient to show this, since it showed no more, it found itself in the position of the government in United States v. Masciale, 2 Cir., 236 F.2d 601 and, United States v. Sherman, 2 Cir., 200 F.2d 880, of having, as was said in United States v. Sherman, 2 Cir., 240 F.2d 949, at page 951, "shown without more that the defendant was induced by government agents to engage in the proscribed activity and no conviction may be had."; and the verdict of acquittal should have been directed on that ground.

The defendant, however, did not then move for judgment but took the stand in her own behalf, not to deny that Sutton had delivered her the money and had obtained the narcotics he sought, but to testify that what she did and all that she did was under the direction of, and as agent and friend of, Sutton, and to help him obtain the capsules, for the obtaining of which he had solicited, indeed implored, her aid.

In the course of this testimony, she stated positively and never varied from it that Sutton, an addict, and convict, and his wife, also an addict, were both known to her, that in fact Sutton was almost a relative, and that she had done what she did under his direction to get the drugs for him and his wife.[1]

---

1. To the question, "Now, can you give us the facts concerning those instances?" she answered:

"Yes, sir. I don't know exactly the days it was on, but Henry Sutton, he called and told me he wanted some stuff, he and his wife was sick, and would I get it for him. I said I didn't know where to get it and I didn't have any money, and he said if he would tell me where to get it and bring the money, would I get it. I told him I would try. He said he would come over and meet me and bring the money about eleven o'clock. I went where I was supposed to meet him and got in the car, and I had already talked to the people that he said I could get it from and they said they would have the stuff and I could pick it up, and that was up on Alabama and Ennis. When we was downtown, we was in a coffee shop in the bus station. We met on Congress and Milam. He gave me the money and him and me walked down to the coffee shop, and he got his package and I didn't get it from him, but he give me the money to give it to this person.

Q. "Where did he get the package from? A. Another person sitting in the coffee shop.

Q "What did he say to you on the second occasion, which I believe is November 20, with respect to your purchasing for him some of this contraband? What did he say? A. Well, it was about the same story. He had called the evening before and asked me to try, and so I was supposed to call him if I could find anybody to get it from. I called several people and

couldn't get nobody, so he called and give me a number to call. I called these people and they said meet them, and that is where we met, down in the coffee shop next morning.

Q. "How much money did Sutton give you, if he gave you any, on November 11? A. He gave me $100 on November 11, and he give me $75 on the day downtown.

Q. "What did you do with that money? A. I gave it to the people I went to get the stuff from.

Q. "Did you use any of that narcotics that you say you purchased on those two dates yourself? A. No, sir, I didn't.

Q. "Did you make any profit on your alleged purchases? A. No, sir.

Q. "Would you have made those purchases save and except the calls you say you received from Sutton? A. No, sir. I wouldn't have had no cause to, I mean since we were good friends and practically relatives, I guess.

Q. "I believe you testified Sutton told you that he was sick? A. Yes, sir.

Q. "Did you feel sorry for him? A. Yes, sir. As I said, we are good friends and he had done me small favors, and he said it was all right for me to go to these people and I figured it would be all right. I didn't figure it would be anything like what happened behind it. This, I mean.

Q. "Did you know those people from whom you made those purchases, or whom you contacted in response to a request by Sutton? A. I met them through his introduction. He told me about them, and I guess he told them about me.

At the conclusion of her testimony, the defendant rested, and though the informer was available to the government, he was not put on the stand, nor was any evidence offered in rebuttal of defendant's clear and positive statements as to what she had done and why she had done it. Defendant then moving for acquittal, her motion was denied, and she was convicted on all counts and sentenced on each to serve ten years, the sentences to run concurrently.

As the Supreme Court did in the Sherman case, "we conclude from the evidence that entrapment was established as matter of law". As it was in that case, "it is patently clear" on the evidence that the victim of the informer's activities "was induced by" him. The fact that, in this case, the defendant took the stand and by her own testimony disclosed the circumstances of the entrapping and the informer was not called by the government to dispute or deny the defendant's testimony, does not, we think, make this a different case. Here,

> Q. "What did you do in each instance after you received those two packages? A. I carried and gived it to Dutch.
> Q. "Dutch, is that Sutton's nickname? A. Yes, sir.
> Q. "Did you buy any of this contraband on these two occasions for yourself? A. No, sir.
> Q. "Do you use narcotics now? A. No, sir, I don't.
> Q. "Tell the Court what you understand the term to mean, 'sick'. A. Well, because I had a habit before I went to the penitentiary and I know what it is, and I knew Thelma to be sick and I have seen her sick, and I knew when a person is sick from drugs, and he asked me to go and he couldn't go, and that is the reason I got it for him.
> Q. "Did or not John Henry Sutton or Henry Sutton, when he called you on these two occasions, say anything about his wife's condition? A. Yes, he did. He said he was going to put her in the hospital in December if he could make it until then, because he was expecting to go to court on this case.
> Q. "Did he not tell you his wife was sick also? A. I said she was.
> Q. "Did he not tell you he also was sick? A. The evening he called, they both was. When he come to the house to bring the money he was, but he said

outside of an agent's unresponsive and inadmissible conclusion in answer to a question on cross-examination,[2] the only evidence that she was or had been connected with narcotics violations was, as in Sherman's case, that she had been convicted in 1952, five or more years ago, and had served a term therefor. As in that case, no narcotics were found on the defendant or in her premises, and there is positive and uncontradicted evidence that she made no profit on the transaction and that she did not use any of the drugs for herself, indeed that she was not a user or seller.

■ We are also of the opinion on the record as it now stands, that, for the reasons stated in United States v. Sawyer, 3 Cir., 210 F.2d 169 and Adams v. United States, 5 Cir., 220 F.2d 297, the defendant acted, not for herself but as the subagent of, and conduit for, the government's provocator, and, because, acting for the government, he was not guilty of any offense, neither was she.

> he could make out if he could get the stuff for her.
> On Cross-examination—
> Q. "Leona, in your past you have been addicted to narcotics; is that correct? A. Yes, sir.
> Q. "And you, as a result of taking the cure, are no longer addicted? A. I didn't exactly take the cure. I only was on it three months, and I got sent away for over three years and I have been back over 18 months, and I haven't used it in that time.
> Q. "You don't personally use narcotics? A. No, sir.
> Q. "Isn't it a fact that the only addiction you have to narcotics today is the selling of it, the selling of heroin? A. I don't sell narcotics.
> Q. "You don't sell narcotics? A. No, sir. I haven't sold any."

> 2. Q. "Is it fair to say that in giving him this money, meaning John Henry Sutton or Henry Sutton, your deliberate motive or the motive of the narcotics department here was to see if they couldn't get a case on the defendant; isn't that right? A. As we had knowledge that she was in the traffic, we tried to make a case on her.
> Q. "The answer to that is yes, is it not? A. That is right."

The judgment is, therefore reversed and the cause is remanded for another trial, on which, if the truth is otherwise than as on this record it appears, it may be made manifest.

Reversed and Remanded for Trial Anew.

CAMERON, Circuit Judge (dissenting).

Borrowing a phrase from the first sentence of appellee's argument, we repeat what we believe is a universally accepted fact, that the traffic in narcotics is "dirty business". The terrible toll being taken of the lives and well-being of the citizens of this country, particularly of its youth, was well expressed in a recent message by the Governor of New York to the Legislature of that State: [1]

> "Among the many consequences of the tension and unrest of the post-war world none is more intrinsically terrible than the steady rise of drug addiction among the youth of our nation. * * * And yet in spite of these efforts the drug traffic has continued to spread, the number of addicts has continued to grow. Narcotic arrests in New York City alone have risen six hundred percent in the past decade; arrests of persons under twenty-one have increased 2,-300 percent * * *."

State legislatures have responded to the tragic situation, as has Congress, by tightening the laws against those who engage in this nefarious business. But the courts are, in many instances, going in the other direction as, in my opinion, the majority here, and the courts in the cited cases, have been and are going.[2] That attitude it has seemed to me, is born in many instances of a condemnation of the methods employed by the government in apprehending those engaged in handling narcotics and presenting their cases to the courts. My own disposition is rather to applaud the courage demonstrated by government agents who are willing to risk their lives by getting down into the mire where alone participants in the narcotic business can be found.

The defense here is solely that appellant was entrapped. The Judge heard all of the testimony and saw the witnesses who gave it and, in my opinion, there was ample evidence to support his finding against the defense of entrapment. We who do not occupy his vantage point are here repudiating his findings, intimating that we will not accept such a finding if the government does not place the informer upon the stand.

I am unable to give my assent to such a view. I think the cases show that it is almost impossible to convict narcotic dealers without the help of informers who, in most instances, are the unfortunate victims of the dirty business with which we are dealing. Anyone willing to recognize realities can see a number of reasons why the government should not be forced to place the informer upon the stand if it can make its case without doing so. In my opinion, the evidence before the court below was sufficient without the use of the informer, and the court below was justified in holding that the defense of entrapment had not been established.

So believing, I am constrained to set down thus briefly the grounds of my dissent. It is not possible to read this record without feeling a strong sympathy for appellant. A share of that sympathy should, in my opinion, be reserved for the hapless victims referred to by the Governor of New York.

1. See dissenting opinion in Shurman v. United States, 5 Cir., 233 F.2d 272, 280, footnote 6.

2. And cf. Indiviglio v. United States, 1958, 357 U.S. 574, 78 S.Ct. 1381, 2 L. Ed.2d 1547, reversing our decision reported in 249 F.2d 549; and Giordenello v. United States, 1958, 357 U.S. 480, 78 S.Ct. 1245, 2 L.Ed.2d 1503, reversing our decision reported in 241 F.2d 575; and see Gilmore v. United States, 5 Cir., 1958, 256 F.2d 565.